*Inhabitants of* PORTLAND *vs. Inhabitants of* NEW-GLOUCESTER.

Before the pauper was two years old, his mother being then dead, his father, living in *Baldwin*, gave him away to one *Sanborn* and his wife, then living in *New-Gloucester* or in the vicinity, to be brought up as their own child, and never after exercised any control over him, never supplied him with any thing, never took care of him, or received any thing from him, and never saw him, excepting once or twice as a visitor. The pauper continued from that time until after he became twenty-one years of age, to be a member of the *Sanborn* family, who were very poor and drunken, and was by them regarded as having a home with them, and he considered his home there, and whatever of control over him was exercised by any one, was exercised by the *Sanborns*. On *March* 21, 1821, the pauper, being then a minor, dwelt and had his home with the *Sanborns* in *New-Gloucester*. The Court held, that the pauper was emancipated, and therefore gained a settlement in *New-Gloucester*, by thus residing there at the passage of that act.

THIS action was to recover expenses for the support of *Daniel Kelley*, his wife and children, alleged to have their settlement in *New-Gloucester;* and the question at issue was, whether the settlement of the paupers was in that town? The plaintiffs introduced testimony tending to prove, that *Daniel Kelley*, who was the son of *Isaac Kelley* of *Baldwin*, was, when between one and two years of age, carried by his father to the residence of *Solomon Sanborn* and wife, in *Thompson Pond Plantation*, or *New-Gloucester*, and

given away to *Sanborn* and wife, by the request of the child's mother, who was a sister of *Sanborn*, and who had then lately deceased, as their own child; and that the father of the pauper never afterwards exercised any control over him or supplied him with any thing, or received any of his earnings, and that he never visited him but once or twice afterwards, and that *Daniel Kelley* remained with the *Sanborn* family as a member of it until he was married; that from 1822, being then from fourteen to sixteen years of age, he went out to work in the summer seasons for about five years, and one or more winters, returning to *Sanborn's* when not so employed. There was testimony tending to prove, that the *Sanborns* were very poor all the time, and that they lived in log huts put up as temporary abodes, in various places in *Thompson Pond Plantation*, in *Raymond*, on the eighty rod strip so called, and in *New-Gloucester*, and that they wandered about begging and doing occasionally little jobs of work for a day or two, and that *Kelley* was about, often with them or one of them. Some of the witnesses spoke of *Sanborn* as a common beggar and common drunkard, and *Sanborn* and wife had been supported by the town of *New-Gloucester* for the last nine or ten years. There was testimony tending to prove, that on *March* 21, 1821, the *Sanborns* lived in a house or hut in *New-Gloucester*, and had so done for a year or two before, and that *Kelley* was there with them, and also testimony contradictory thereto.

At the trial before SHEPLEY J. the evidence was all submitted to the jury, who were instructed, that if from the testimony they were satisfied, that the father of the pauper, when he was between one and two years of age, his mother being dead, gave him away to the *Sanborns* to be brought up as their own child, and that the father never exercised any control over the child after that time, and never supplied him with any thing, or took care of him, or received any thing from him, or saw him except once or twice as a visitor, and that he continued from that time until he was married, to be a member of the *Sanborn* family, and was by the *Sanborns* regarded as having a home there, and that he considered that his home, and that whatever control over him was exercised by any one was exercised by the *Sanborns*; he should be regarded as emancipated. And that if they should find that he was emancipated, they

would consider the testimony relating to the residence of the *Sanborns* on *March* 21, 1821, and if satisfied, that they at that time had their residence and dwelling in *New-Gloucester*, then *Kelley*, if then resident with them, would acquire a settlement in *New-Gloucester*; that if *Kelley* was not on that day actually in that family, yet if they were so resident in *New-Gloucester*, and *Kelley* was a member of their family, and both he and they regarded that as his home, if absent on that day and for a few weeks or months, designing at the expiration of that time to return there as his home; he must be regarded as having his residence in *New-Gloucester* on that day; and that if the jury were not satisfied that *Kelley* was emancipated, and that he was a resident of *New-Gloucester* on *March* 21, 1821, upon the principles before stated, their verdict should be for the defendants; and if so satisfied, for the plaintiffs. The verdict for the plaintiffs was to be set aside, if the instructions were erroneous.

The parties agreed, that the Judges living in *Portland* should sit in the case.

*S. Fessenden & Deblois* argued for the defendants, that the facts proved in the case did not show an emancipation. There is no such thing as an emancipation, when the father has the power of reclaiming the child. This power he could exercise at any day. The question is this, is a parent at liberty to abandon his child to a beggar and a drunkard, and thus be freed alike from his duties, his liabilities and his rights? It is utterly opposed to the moral obligations between parents and children, to the interests of society, and to the laws of the State. During minority, the child must be under some one, and while the father lives, it must be under him, and he cannot delegate the power to another. The legitimate minor cannot have a settlement separate from its father's in the father's lifetime. *Wells* v. *Kennebunk*, 8 *Greenl.* 200; *Lubec* v. *Eastport*, 3 *Greenl.* 220; *Wiscasset* v. *Waldoborough*, *ib.* 388; *Sidney* v. *Winthrop*, 5 *Greenl.* 123; 3 *T. R.* 114; *ib.* 353; *ib.* 355; 2 *B. & Ad.* 865; 2 *B. & Cr.* 345; 8 *T. R.* 479; *Reeves' Dom. Rel.* 283; *Charlestown* v. *Boston*, 13 *Mass. R.* 469; *Springfield* v. *Wilbraham*, 4 *Mass. R.* 493; *Dedham* v. *Natick*, 16 *Mass. R.* 135; 2 *Johns. R.* 375. But if the father could abandon his duties and his rights, he merely transferred them to *Sanborn*,

and the child was under his control, as he otherwise would have been under his father's, and is not emancipated.

*Longfellow, Sen.* argued for the plaintiffs, that the only question in the case was, whether the Judges' instructions in relation to what constitutes an emancipation are correct. The jury have settled all the rest in our favor. The father has the power to give up and surrender his parental rights over the child. This he did, and this is of itself an emancipation. There is no distinction in the pauper laws between the rich and the poor. The same rule holds as to both, until they become paupers. The instructions of the Judge are fully supported by the cases *Wells* v. *Kennebunk*, 8 *Greenl.* 200; *Leeds* v. *Freeport*, 1 *Fairf.* 356; *Springfield* v. *Wilbraham*, 4 *Mass. R.* 496. The decisions go to the full extent, that a minor may gain a settlement, if emancipated. *Parsonsfield* v. *Kennebunkport*, 4 *Greenl.* 47; *St. George* v. *Deer Isle*, 3 *Greenl.* 390.

The opinion of the Court was drawn up by

WESTON C. J.— The jury have found, that the pauper resided, on the twenty-first of *March*, 1821, in the family of *Solomon Sanborn*, at his house in *New-Gloucester*. That before he was two years old, the father of the pauper had relinquished to *Sanborn* his parental rights over the child.. That he had accepted him, and that from that period, *Sanborn's* house was regarded by him, the father and the child, as his home. That thereafter, he received no maintenance or assistance from the father, who practically divested himself of all care or control over the child, the duties belonging to the parental relation, so far as they were fulfilled, being assumed and discharged by *Sanborn*.

If a minor cannot, by any voluntary act of his own, change his domicil or acquire a new one, without the consent of his father, or his mother, if she be the surviving parent, there seems no good reason why this may not be done, by the appointment of his father and the free consent of all, whose interest may thereby be affected. And in the case before us, it does appear, that *Sanborn's* house, under the circumstances, became the pauper's home. This however is not necessarily or uniformly coincident with settlement. It was made so, at the period referred to by the literal terms of the

statute, upon which the plaintiffs rely. A question then arises, whether there is any limitation or exception to the generality of its application. Such exceptions have obtained even under the pauper laws, which depending upon positive and arbitrary enactment, have generally received a strict construction.

Thus, under the act of *Massachusetts*, of 1793, *c.* 34, the ninth mode of gaining a settlement, although extending by its terms to every person, without any discrimination as to age, which is made in other modes in the same statute, has been understood not to apply to minors, who had parents living. *Hallowell* v. *Gardiner*, 1 *Greenl.* 93, and the cases there cited. So although the second mode, in the same statute, provides, that legitimate children should follow the settlement of their father, until they gain one in their own right, this has been held to be limited to the settlement of their father, during their minority, and not to extend to a settlement acquired by him, after they cease to be minors. *Springfield* v. *Wilbraham*, 4 *Mass. R.* 493.

Under the statute in question of *March* 21, 1821, *c.* 122, *sec.* 2, which fixes the settlement, where the party dwelt and had his home on that day, notwithstanding the generality of its terms, it has been held, with certain exceptions, not to extend to minors. *Lubec* v. *Eastport*, 3 *Greenl.* 220. *Mellen C. J.* there says, " it is very clear that a wife and minor children, which compose a part of the husband's and father's family, cannot gain a settlement distinct from his. It would lead to a separation of husband and wife, and parents and children. Policy forbids this." And the necessity and propriety of a construction, which will avoid such a result, is enforced in *Hallowell* v. *Gardiner*, before cited, and in *Shirley* v. *Watertown*, 3 *Mass. R.* 322.

The exception is to be limited by the reason, upon which it is founded. Hence in *Lubec* v. *Eastport*, it was decided, that it does not embrace the case of minors, who are emancipated. In *Springfield* v. *Wilbraham*, *Parsons C. J.* holds, that the principle of derivative settlements, in the case of minors, is founded on the right of the father to their services and to the control of their persons. When this ceases, he adds, " it is not easy to devise any good reason, why they should not be considered as emancipated."

The principle is held to depend upon rights, which may be waived or transferred, and not upon duties, which are matter of legal or moral obligation. A father may emancipate his child, or transfer his parental rights to another. But this does not relieve him from the obligation of furnishing them with necessary support, if it is not otherwise provided. And this obligation does not even cease with minority, if the parent be of sufficient ability. The duties and obligations of the parent, are not now the subject in controversy. The case finds a direct and express waiver and transfer of parental rights, fully and practically carried out from infancy, without any interference whatever on the part of the father. The appointed and substituted home, such as it was, was always made welcome to the child, and was acceptable to him. He *could have* remembered no other. He knew no other. It appears to us, therefore, to be a case, not within the reason of the exception, raised by the construction, to the literal operation of the statute.

In *Wells* v. *Kennebunk*, 8 *Greenl.* 200, emancipation was held to result from the waiver of parental rights, and the substitution of another home, not so direct and less strongly marked, than are presented here. The father of the pauper was insane, and incapable of legal volition. He died the year before the act of 1821 passed, whereupon the mother became the head of the family, and entitled as such to the services of the minor and the control of his person. *Dedham* v. *Natick*, 16 *Mass. R.* 140. He was left at her father's for many years, and was there residing at the passage of the act of *March*, 1821. Her relinquishment of her parental rights, was deduced by implication from the facts and circumstances. *Mellen C. J.* says, "she seems to have resigned him (the minor) to the care, government and protection of the grandfather." What was there matter of inference, is here expressly proved and found.

Judgment on the verdict.