## DUNKS v. GREY.*

*(Circuit Court, E. D. Pennsylvania. September 14, 1880.)*

1. CONTEMPT—INJUNCTION—PATENT—LIABILITY OF FATHER FOR ACTS OF MINOR SON.—A father who had been enjoined from selling certain patented articles, *held*, under the peculiar circumstances of this case, liable to attachment for subsequent sales of such articles by his minor son, who was living with him and was still under his control.

2. SAME—EMANCIPATION.—The fact that the father allowed the minor son to receive and spend his own wages is not of itself such a complete emancipation of the son as to relieve the father from liability for the son's acts.

3. SAME—PRACTICE—COSTS.—The son having filed an agreement not to sell the patented article, no attachment was issued against the father. The latter was ordered to pay the master's fee, the other costs to abide the final result of the cause.

Rule to show cause why attachment should not issue against respondent for contempt in not obeying a preliminary injunction restraining him from manufacturing and selling articles infringing complainant's patents. Upon the return of the

*Reported by Frank P. Prichard, Esq., of the Philadelphia bar.

rule the matter was, by agreement of counsel, referred to a master, who found the following facts:

The respondent, Truman N. Grey, had been, in 1876, the general agent in Philadelphia of H. W. Ladd, a spring-bed manufacturer of Boston, Mass., who had a branch store in Philadelphia. In that year respondent took into his employ his minor son, E. H. Grey, then about 14 years of age. In 1877 the business of the branch house declined, and in order to revive it respondent began to make trips and sell goods throughout the adjacent territory, leaving his son, by direction of Mr. Ladd, in charge of the Philadelphia store. As these trips proved successful, they were gradually increased in number and duration, until they occupied a large portion of respondent's time. Meanwhile the son had developed a talent for business, and had, with the consent of his father, gradually assumed the general management of the business of the Philadelphia branch, conducting the correspondence, fixing prices, planning his father's trips, etc., until in 1880, although only 18 years of age, he was performing all the duties of general manager, while his father acted only as traveling salesman. The son's salary had been from time to time increased by Mr. Ladd, until, in 1879, it was raised above that of his father. No written agreement, and no express verbal agreement, was ever made between the father and son, or between either of them and Mr. Ladd, in reference to the character or duration of the son's employment, but all three parties had, for at least a year and a half before this suit, acted as though the son were the general manager, and the father only traveling salesman. The son was unmarried and lived at home with his father, but was allowed to receive and spend his own salary, and paid board to his father.

The complainant, after bringing suit in Philadelphia against Mr. Ladd, and failing to obtain service therein, brought suit against respondent and obtained a preliminary injunction restraining him from selling articles infringing complainant's patents. After service of this injunction, respondent, in his employment as traveling salesman, refrained from personally

manufacturing or selling the articles included in the injunction, but his son, acting as agent for Mr. Ladd, continued to carry on their manufacture and sale. Respondent advised his son not to do this, but on learning from his son that the latter intended to disregard this advice, he made no remonstrance and no attempt to interfere by the exercise of his parental authority. Two questions arose before the master: *First.* Whether respondent was the real head of the Philadelphia branch and the alleged agency of his son merely a fraudulent device to evade the injunction. On this question the master found in favor of respondent. *Second.* Whether the respondent was answerable for the acts of his son. On this question the master found that the son was still within his father's control; that while there was an emancipation so far as to vest in the son the property in his wages already earned, and the right to receive future wages, at least until some act of revocation on the part of the father; yet that the evidence did not show an intention on the part of the father to wholly emancipate the son from parental control.

As to the law applicable to these facts the master found as follows:

"How far a father is responsible or answerable for the torts of his minor child is a question not entirely settled. The tendency of the authorities is against holding the father responsible for acts of his minor children done without his knowledge or authority, and out of his presence, and to throw the burden of proof in such cases upon the party seeking to charge the father. *Moon* v. *Towers,* 8 C. B. N. S. 611; *Tifft* v. *Tifft,* 4 Denio, 175; *Edwards* v. *Crume,* 13 Kan. 348; *Wilson* v. *Garrard,* 59 Ill. 51; *Paulin* v. *Howser,* 63 Ill. 312; *Chandler* v. *Deaton,* 37 Tex. 406; *Baker* v. *Haldeman,* 24 Mo. 219. When, however, the act is committed in the presence of the father, or the circumstances show that it was done with his knowledge and by his authority, either express or implied, he is liable. Thus, in *Strohl* v. *Levan,* 39 Pa. St. 177, a father was held liable in trespass for an injury committed by the son while driving his father's team, the father being present in the wagon at the time. It is true that in this case

it does not appear that the son was a minor, and the decision rests on the relation of master and servant, rather than on that of father and son. But in *Beedy* v. *Reding*, 16 Me. 362, a father was held liable in trover for wood taken at three different times by his minor sons, under circumstances which justified the jury in finding that it was taken with the father's knowledge, the court saying: 'The minor sons of the defendant, being at the time members of his family, with the defendant's team, at three several times, hauled away the plaintiff's wood. This could hardly have been done without the defendant's knowledge, if it had not his approbation. It was his duty to have restrained them from trespassing on his neighbor's property. *Qui non prohibit cum prohibere possit, jubet.* And this maxim may be applied with great propriety to minor children residing with and under the control of their father.' See, also, *Lashbrook* v. *Patten*, 1 Dewall, 316.

"This principle, if applicable to the present case, is fatal to the position assumed by respondent. But it was earnestly argued by respondent's counsel that the evidence showed that Elmer H. Grey had been emancipated by his father and was therefore beyond his father's control, and a number of authorities were cited in support of this position. It is, doubtless, true that the liability of the father for the acts of his minor son has its foundation in the right of the father to the custody and service of the minor, and it would follow that when, either by bad conduct, by misfortune, or by contract, the rights and duties incident to the parental relation had been entirely abandoned or abrogated, the liability of the father would cease. It has, however, been pointed out by Mr. Schouler, in his work on Domestic Relations, 561, that 'the significance of the word *emancipation* is not exact,' and it appears to be used by the courts sometimes to signify the mere gift by a father to his son of the latter's earnings, and sometimes to signify the complete severance, so far as legal rights and liabilities extend, of the parental relationship. Most of the cases cited by respondent involve the validity of a gift by a parent to his minor child of the latter's earnings. These cases, together with the other authorities examined by

the master, establish that a father may agree with his child to allow the latter to receive the earnings of his labor, and to enter into contracts with third persons to receive wages for future services, (*Cloud* v. *Hamilton*, 11 Humph. 104; Schouler's Domestic Relations, 346;) that such agreement may be implied from circumstances, (*Armstrong* v. *McDonald*, 10 Barb. 300;) that such agreement is not *per se* fraudulent as to creditors, (*Chase* v. *Elkins*, 2 Vt. 290;) that the father cannot revoke such agreement so as to defeat the title of the child to wages already earned, (*Torrens* v. *Campbell*, 74 Pa. St. 470;) and that creditors cannot compel him to revoke it as to future earnings, (*McClosky* v. *Cyphert*, 27 Pa. St. 220.) Whether, as between the father and child, the former may revoke such an agreement, made without consideration, as to future earnings, is not definitely settled. See *Hall* v. *Hall*, 44 N. H. 293; *Chase* v. *Elkins*, 2 Vt. 290; *Abbott* v. *Converse*, 4 Allen, 530; and *Clark* v. *Fitch*, 2 Wend. 459. It certainly is an open question in this state. Compare *Kauffelt* v. *Moderwell*, 21 Pa. St. 222, with *Torrens* v. *Campbell*, 74 Pa. St. 470; and see the opinion of *Sharswood*, J., in *Titman* v. *Titman*, 64 Pa. St. 480–5.

"It may be doubted whether, in the present case, there is sufficient evidence to establish an agreement by respondent to waive his right to all of his son's future earnings. Such an agreement is not always to be implied because the minor is allowed to enter into a contract in his own name. *Monaghan* v. *The School District*, 38 Wis. 100. Nor is it conclusively established by the mere acquiescence of the parent in the receipt by the minor of his present earnings. *Clark* v. *Fitch*, 2 Wend. 459; Schouler's Dom. Rel. 369. But concede that the present case falls within the principle of the cases cited by respondent, and that there is an implied agreement that Elmer H. Gray shall receive his earnings,—an agreement which would prevent respondent from suing for or appropriating those earnings while he allows his son to remain in Mr. Ladd's employ,—yet it by no means follows that he had completely emancipated Elmer H. Gray from all control, and had surrendered all parental authority over the latter's person

and actions. That a minor may acquire and hold property while he is under his parent's control is well settled, and there would seem to be no reason why a gift of his earnings, any more than a gift of any other property, should operate as a complete severance of all the mutual rights and duties arising out of the relationship. As was said by the court in *Johnson* v. *Silsbee*, 49 N. H. 543–5, the right of the child to his earnings does not depend upon the question whether he has been fully emancipated; and in *Everett* v. *Sherfey*, 1 Iowa, 356, the right of the father to the custody and control of a child of 17 years of age, and to enforce such right by an action against a stranger who harbored and employed the minor against the father's consent, was sustained, notwithstanding that prior to the time when the father asserted his control he had permitted the child to enter into contracts of employment, to receive his wages, and to reside away from home. The master is, therefore, of opinion that notwithstanding some *dicta* in the cases cited by respondent's counsel they are not applicable to the issue here raised. \* \* \*

"There is a class of cases involving the effect of emancipation upon the legal settlement of the minor which raises a question more nearly analogous to the one in the present case than that raised by the cases cited on behalf of respondent. In the recent case of *Lowell* v. *The Inhabitants of Newport*, 66 Me. 78, decided in 1876, most of the cases on this subject are considered and discussed, and the conclusion adopted by the court is expressed as follows: 'From these cases, as well as from others in harmony with them, the principle to be deducted is that emancipation, such as will affect a settlement under the pauper law, however it may be in other cases, must be an absolute and entire surrender, on the part of the parent, of all right to the care and custody of the child, as well as to its earnings, with a renunciation of all duties arising from such a position. It leaves the child, so far as the parent is concerned, free to act upon its own responsibility, and in accordance with its own will and pleasure, with the same independence as though it were 21 years of age. Indeed, the best test that can be applied is the separation and resulting

freedom from parental and filial ties and duties which the law ordinarily bestows at the age of majority.' An examination of the numerous cases cited in this opinion shows that in no case has a complete emancipation been inferred from the mere acquiescence of the parent in the child's contracting for and receiving his own earnings, nor in any case where the child had never left the parental home, and was employed in the same place and business as the father.

"Emanicipation being the exception, and not the rule, the burden is upon those who assert it. *Sumner* v. *Sebec*, 3 Me. 223. The master has already reported that he found no evidence of any intention on the part of the father to surrender all right to the control of his son, and the authorities cited by the respondent do not satisfy him that there is a legal inference of such emancipation arising from the circumstances. * * * The master is, therefore, of opinion that Elmer H. Grey is still within the authority and under the control of the respondent. What, then, was the respondent's duty in the premises? 'An order for an injunction or *interim* restraining order must be implicitly observed, and every diligence must be exercised to obey it to the letter.' Kerr on Injunctions, 569.

"It has been held that it is a violation of an injunction for the defendant to be present at the commision of the act enjoined, aiding and abetting, although not actually taking part in it, (*St. John's College* v. *Carter*, 8 Law Jour. Eq. N. S. 218;) or, under some circumstances, to stand by and quietly suffer the injunction to be violated, (*Stimpson* v. *Putnam*, 41 Vt. 238, 246; *Blood* v. *Martin*, 21 Geo. 127;) or to neglect to countermand a writ of execution after proceedings have been enjoined, (*Woodley* v. *Bodington*, 9 Simp. 214;) or to do the act enjoined as agent or servant for another person, (*Potter* v. *Muller*, 1 Bond, 601; *Sickles* v. *Borden*, 4 Blatch. C. C. 14;) or to work for wages in a factory, the product of which is the prohibited article, (*Goodyear* v. *Mullee*, 5 Blatch. C. C. 429;) and defendant is liable to attachment for the acts of his servant, although done without his knowledge, (*Rantzen* v. *Rothschild*, 14 W. R. 96.)

"The master is of the opinion that, under the principles laid down by these authorities, the respondent could not quietly acquiesce in the sale of the prohibited articles by his minor son in the course of a business in which he was himself employed and from which he drew his salary; but that he was bound to have exercised his parental authority to prevent the violation of the injunction, and is liable to attachment for failure to do so. It may be that if he can afterwards show to the court that he has made the attempt to exercise such authority; that he has exhausted every means of compelling obedience, and that he is unable to prevent the violation of the injunction, he may be relieved from further liability; but up to this time he has mode no such attempt to exercise his authority, even to the extent of remonstrance, and therein, in the master's opinion, he has failed to obey the decree of the court. For these reasons the master is of opinion that the attachment should be issued."

Both parties filed exceptions to this report—the complainants upon the ground that the testimony showed actual fraud, and the respondents upon the ground that the testimony showed an emancipation of Elmer H. Grey, and that the latter's actions did not render his father liable to attachment.

*Thomas J. Grier* and *George W. Dyer*, for complainant.

*John E. Shaw*, for respondent.

BUTLER, D. J. The court is of opinion that the exceptions should be dismissed and the master's report confirmed, but will not issue the attachment if the respondent will obtain from his son, and file in court, an agreement to refrain from hereafter manufacturing or selling the articles which infringe complainant's patents.

Subsequently such an agreement was executed by the son, with the consent of the Boston principal, Mr. Ladd, and was filed by respondent. The court ordered that respondent pay the master's fee, the other costs to abide the final result of the cause.