# IN RE DETERMINING SETTLEMENT FOR POOR-RELIEF PURPOSES OF DANIEL KEITH SONNENBERG. COUNTY OF BECKER v. COUNTY OF HENNEPIN AND OTHERS.

99 N. W. (2d) 444.

November 20, 1959—No. 37,804.

*Sigwel Wood,* for appellant.

*M. J. Daly,* for respondent Hobart Township.

*Owen V. Thompson,* for respondent Otter Tail County.

*George M. Scott,* County Attorney, and *John K. Harvey,* Assistant County Attorney, for respondent Hennepin County.

MATSON, JUSTICE.

Appeal from a judgment determining that a minor child, born in Otter Tail County, has settlement for poor-relief purposes in Becker County.

The primary issue is whether the act of an unwed mother in voluntarily surrendering at the time of birth the possession, care, and custody of her child to others—for the purpose of providing the child with a new parental relationship as by adoption—thereby emancipates the child to the extent that the child thenceforth retains the poor-relief settlement derived at birth from the mother irrespective of any subsequent change in the legal settlement of the mother, by marriage or by removal to another county or state.

The stipulated facts follow: Ardelle Mae Sonnenberg on November 14, 1949, at Fargo, North Dakota, gave birth to the child, Daniel Keith Sonnenberg. At that time she was unmarried and had resided for many years with her parents in Hobart Township, Otter Tail County. Immediately upon birth, Daniel was turned over to the Lutheran Welfare Society of Fargo, North Dakota, which later transferred him to the Lutheran Children's Friends Society of Minnesota with headquarters in Minneapolis, to which place Daniel was removed. On April 11, 1950, the mother executed a formal surrender of the child to the Minnesota organization.

On January 21, 1950, the mother married Milton Anderson, who then resided in North Dakota. The Andersons removed to Minnesota on October 20, 1950, and lived at various places within this state for

short periods of time until October 27, 1952. There are two periods of 15 days each unaccounted for during this period. On October 27, 1952, they removed to South Dakota, where they resided until March 15, 1953, at which time they removed to Ponsford, Becker County, Minnesota, where they still resided on February 24, 1954, the date of filing of the petition in juvenile court of Hennepin County alleging Daniel Keith Sonnenberg to be a dependent child and asking for his commitment to the commissioner of public welfare.

A dispute having arisen as to the settlement of Daniel Keith Sonnenberg for poor-relief purposes, the trial court, after stipulation of the facts, ordered judgment for the counties of Hennepin and Otter Tail and Hobart Township, and against the County of Becker, from which judgment this appeal is taken.

Appellant alleges that the trial court erred in determining Becker County to be the legal settlement of the child for two reasons, first, because the mother's act of surrendering the care and custody of her child at the time of birth emancipated the child so that thenceforth it retained its derivative legal settlement in Hobart Township of Otter Tail County, wholly unaffected by any subsequent change in the legal settlement of the mother and the stepfather and, secondly, because, if the child was not so emancipated, the stipulated facts do not in any event support a finding of 2 years' continuous residence of the stepfather in the state so as to establish a legal residence in Becker County under M. S. A. 261.07, subd. 1.

If it is determined that the child has been emancipated and has thenceforth retained a derivative settlement in his own right (§ 261.07, subd. 3) in Hobart Township of Otter Tail County, it will be unnecessary to consider whether the evidence sustains a finding of an ambulatory settlement within the meaning of § 261.07, subd. 1.

■ The poor-relief settlement of an illegitimate minor child at the time of birth is by derivation from that of the mother and, in the absence of emancipation and settlement in his own right (subject to certain statutory qualifications not here involved—see § 261.07, subd. 3), the child's settlement normally changes from time to time to correspond to any changes in the mother's settlement whether such changes

574

in her settlement are effected by removal to another community or by derivation from an after-acquired husband.[1]

■ Did the act of the mother, in voluntarily and unconditionally giving and surrendering the care and custody of the child at the time of birth to the Lutheran Welfare Society of Fargo, so emancipate the child that the original poor-relief settlement, which it derived from the mother at birth, was not thereafter subject to change whenever the mother subsequently acquired a new settlement? That the mother intended the initial surrender of her child to be absolute and unconditional so as to deprive her permanently of all parental right of control is confirmed by the fact that she subsequently executed a formal surrender of her child to the Lutheran Children's Friends Society of Minnesota to whom a transfer of the child had been made by the affiliated organization at Fargo. By reason of her act the child has not since birth resided with any parent within the meaning of § 261.07, subd. 3. Furthermore, it cannot be said that the child, if emancipated, had acquired a settlement in his own right. Whatever settlement he has is one of derivation.

In addition to absence of the element of *settlement in his own right,* there is another missing factor which leaves § 261.07, subd. 3, inapplicable, and that factor is found in the provision which relates to the situation where a minor child living apart and unsupported by his parents acquires the settlement of the person with whom he has resided for 2 years. Although the child herein has lived for more than 2 years in the care and custody of an adoption agency, he has not resided with any *person* as that term is used in any subdivision of the statute. Assuming there has been an emancipation, we in any event clearly have a situation which falls outside the provisions of § 261.07, subd. 3.

Since we are concerned with a child whose only settlement for poor-relief purposes is derivative, it is helpful to bear in mind that the principle of derivative settlement is founded on the traditional right of the father to the services of his children and to the control of their persons. In the early Massachusetts pauper-settlement case of Springfield

---

[1] In re Settlement of Baalson, 211 Minn. 96, 300 N. W. 204.

v. Wilbraham (1808) 4 Mass. 493, 495, Mr. Chief Justice Parsons said:

"* * * when the father ceases to have any control over his children, or any right to their service, it is not easy to devise any good reason why they should not be considered as emancipated, and as no longer having a derivative settlement with the father on his acquiring a new settlement. And when the reason ceases, the law founded on that reason also ceases."[2]

Although the emancipation of children as we know it today was not known under the English common law, the doctrine has been applied with considerable liberality in the United States[3] in meeting new problems and conditions. In fact it has long been applied to minors to determine settlement in poor-relief cases as well as for other purposes. It is well settled that a child upon emancipation takes the settlement of his father at the time of emancipation and thereafter acquires new settlements independently of his father.[4]

■ Since emancipation traditionally and usually is involved only in cases of adolescents old enough to work and earn a living for themselves, the question for our consideration is whether the doctrine also applies to an infant of only a few months or days of age.

It has been urged that emancipation is not applicable to a child of tender age, on the theory that emancipation necessarily carries with it the implication that the minor has reached an age where in some substantial degree he is possessed of the capacity to earn wages and to manage his own affairs. This view is a natural outgrowth of the ever-present tendency of adhering to traditional legal concepts which were developed in an age that had few of the complexities of modern society. Emancipation in its traditional form occurred upon the at-

---

[2]Cited with approval in the leading case of Town of Tunbridge v. Town of Eden, 39 Vt. 17.

[3]Lufkin v. Harvey, 131 Minn. 238, 240, 154 N. W. 1097, 1098, L. R. A. 1916B, 1111; Patek v. Plankinton Packing Co. 179 Wis. 442, 190 N. W. 920. See 5 Vernier, American Family Laws, § 282, where the author speaks of emancipation at common law.

[4]In re Settlement of Horton, 212 Minn. 7, 2 N. W. (2d) 149.

576

tainment of majority or upon an earlier marriage.[5] Later it was applied to protect the status of a minor who had been given his freedom to contract with others for wages and to support himself as if he were of age. Practically all these early cases assumed that emancipation necessarily involved a complete severance of all ties, rights, and obligations between parent and child. With the passage of time a number of courts, including this court, have come to recognize (although loath in many instances to recognize what they were doing by name[6]) that emancipation may be complete, partial, conditional, absolute, or limited as to time or purpose.[7] Divergent views as to the meaning and effect of emancipation stem primarily from the inexactitude with which the term is used. As was said in the findings of the master in Dunks v. Grey (E. D. Pa.) 3 F. 862, 865, the significance of the word "emancipation" is not exact, and it is used sometimes to signify a mere gift by a father to his son of the latter's earnings, and sometimes to signify the complete severance, so far as legal rights and liabilities extend, of the parental relationship.[8] Inexactitude in the use of legal terms is not an unusual byproduct of the judicial process of adapting traditional concepts to new problems and conditions.

■■■ Since an emancipation may be partial and limited as to purpose, there is no reason why a child of tender age may not be emancipated to the extent of terminating all parental rights of control and service for the purpose of eventually providing the child with a new family connection. There can be no objection to such partial emancipa-

---

[5]Clad, Family Law (December 1958) A. L. I. p. 45, a publication prepared by Joint Committee of American Law Institute and American Bar Association.

[6]Ibid. p. 46.

[7]Lufkin v. Harvey, 131 Minn. 238, 154 N. W. 1097, L. R. A. 1916B, 1111; Porter v. Powell, 79 Iowa 151, 44 N. W. 295, 7 L. R. A. 176; Corbridge v. Corbridge, 230 Ind. 201, 102 N. E. (2d) 764; P. J. Hunycutt & Co. v. Thompson, 159 N. C. 29, 74 S. E. 628, 40 L. R. A. (N.S.) 488, Ann. Cas. 1913E, 928; Iroquois Iron Co. v. Industrial Comm. 294 Ill. 106, 128 N. E. 289, 12 A. L. R. 924; 39 Am. Jur., Parent and Child, § 64; 67 C. J. S., Parent and Child, § 86.

[8]Quoted in Kennan, Residence and Domicile, § 138.

tion even though the child has not yet arrived at the age where he is physically and mentally capable of exercising the powers of serving himself and others.[9] In recognition thereof, courts have held that an emancipation may be limited to a termination of parental rights and control without relieving the parent from his legal obligation of furnishing the child with necessary support if needed and if not otherwise provided.[10]

In Porter v. Powell, 79 Iowa 151, 157, 44 N. W. 295, 297, 7 L. R. A. 176, involving the emancipation of a 14-year-old daughter for the limited purpose of earning her own wages, the Iowa supreme court, in holding the father liable for medical expenses, appropriately said:

"* * * The obligation of parents to support their minor children does not arise alone out of the duty of the child to serve. If so, those who are unable to render service because of infancy, sickness or accident—who, most of all others, need support—would not be entitled to it. * * * This obligation to support is not grounded on the duty of the child to serve, but rather upon the inability of the child to care for itself. It is not only a duty to the child, but to the public."

Whatever importance was apparently attached to the duty-to-serve element in the early emancipation cases undoubtedly arose from the circumstance that these cases dealt primarily with a minor's right to retain wages which he had earned in performing service for others.

As a corollary to the proposition that a partial or limited emancipation does not relieve a parent from the obligation of support, since that obligation is basically grounded on the child's inability to care for itself, it follows that such emancipation may apply to a helpless child of tender years. In Swift & Co. v. Johnson (8 Cir.) 138 F. 867, 1 L.R.A. (N.S.) 1161, Judge Van Devanter held that a 9-year-old son had been emancipated by the act of his father in abandoning his family and that the father therefore was only entitled to nominal

[9]But see, 28 Minn. L. Rev. 275, 279.

[10]Lufkin v. Harvey, 131 Minn. 238, 154 N. W. 1097, L. R. A. 1916B, 1111; P. J. Hunycutt & Co. v. Thompson, 159 N. C. 29, 74 S. E. 628, 40 L.R.A. (N.S.) 488, Ann. Cas. 1913E, 928; Portland v. New-Gloucester, 16 Me. 427, 432; 5 Vernier, American Family Laws, § 282.

578

damages in an action for the wrongful death of the son.

In Town of Tunbridge v. Town of Eden, 39 Vt. 17, we have a poor-relief settlement case, similar in facts to the case at bar, wherein it was held that an 18-month-old child was emancipated by the act of the parents in permanently giving the custody and control of the child to another. By reason of such emancipation the court held that the child's initial legal settlement derived from the father thereafter remained unaffected by subsequent changes in the legal settlement of the father. In part, the Vermont court said (39 Vt. 19):

"The important inquiry is whether the pauper was so emancipated that he could not take derivatively from the settlement subsequently acquired by his father. It is conceded that the father of the pauper formerly resided in Tunbridge where he gained a legal settlement, and that the pauper at the same time held a derivative settlement from his father in Tunbridge. It is also conceded that subsequently to the alleged emancipation of the pauper, his father by seven years continuous residence in the town of Eden acquired a legal settlement in the latter town. * * * In order to constitute emancipation of an infant it must appear that his parents have absolutely transferred all their right to the care and control of the infant; and all their right to his services, and that the person to whom such rights are transferred has accepted the infant as his own and agreed to stand *in loco parentis*. It should clearly appear that such was the intention of the parties. In this case it appears that when the pauper was about eighteen months old the father and mother of the pauper gave him to Norman Cook to keep as his own child. * * * The gift of the pauper by his father and mother to Cook was absolute. It depended upon no condition or contingency, the breach or happening of which would restore the child to his natural parents, or revive their right to his services, or their right to the control of his person. It was a gift binding on the parents of the pauper, and such appears to have been their understanding of the matter, for it does not appear, nor is it claimed that the father or mother, after that exercised any control over the child, or supplied him with anything, or took care of him or received anything from him. And it is equally clear that Cook received the child for the purpose and with the intention expressed,

viz: to keep him as his own child; which language imports that he agreed to take and did take upon himself the duties and obligations of a natural parent. * * * The infant thereafter was not known or recognized as a member of his father's family; and the new relation of the infant to Cook was wholly inconsistent with subjection to the control and care of his parents. * * * Upon the facts submitted we are entirely agreed that the pauper was emancipated prior to the father's settlement being perfected in Eden; from which it follows that the pauper did not derive a settlement from the settlement subsequently acquired by his father.

"* * * The doctrine of emancipation of minor children is founded on principles of equity, humanity and domestic policy. The history of this most universal and important domestic relation, furnishes conclusive proof that the parent, by reason of misfortunes, arising from circumstances over which he had no control, or from habits of intemperance and idleness, may be wholly unable to support and educate his offspring, or incapable of having the control of their person. The principle of emancipation is held to depend upon rights which may be waived or transferred, and not upon duties which are matter of legal or moral obligation.

"* * * The necessity for the emancipation of infants may arise from absolute inability of the father to provide for their support. To relieve minor children from sharing the misfortunes of their parents, to prevent consequent discouragement and encourage in them industrial and business habits, to save helpless infants from becoming town paupers, to relieve unfortunate parents from a burden which they are unable to bear, and to place within the reach of their children at least the ordinary advantages of education, to give opportunity for the development of those higher intellectual powers with which many such children are gifted, and to qualify them for the duties of manhood and self government, new relations are contracted by which the parent ceases to have any control over the person of his child, or right to his services."

We consider the foregoing opinion sound. The fact that in the case at bar the child was not received from the mother by a person who

accepted the child as his own is not a material distinction. The mother gave her child up absolutely, and the child-placement agency acted as a protective custodian until such time as a permanent adoptive home could be found. In the present case, as in the Vermont case, all ties beween the parent and child have been severed, and it is this severance of the parent-child relationship which we consider controlling. We adopt the position of the Vermont court on this issue and hold that Daniel Keith Sonnenberg was emancipated by the act of his mother in permanently and absolutely surrendering her control and custody of his person.

Upon emancipation Daniel by derivation took as his own the settlement of his mother, which was Hobart Township, Otter Tail County. Since a child-placement agency is not a person within the meaning of the statute, and since the assumption by such an agency of the temporary custody of a child for placement for adoption purposes does not of itself (however long the period of temporary custody may be) give the child a new parental or family relationship, no change results therefrom in the child's settlement for poor-relief purposes. It follows that after Daniel's emancipation no other settlement was acquired by him or by any other person in his behalf. We conclude therefore that he has at all times retained his original settlement in Otter Tail County.

The judgment of the trial court is reversed.

Reversed in accordance with this opinion.