## EVERETT *v.* SHERFEY.

The father has a right to the care and custody of his minor children, and to superintend their education and nurture; and where he is deprived of such care and custody, and of this superintendence, by the act of another, he has his remedy, by proper action, against such person.

As it is the duty of the father, to educate, protect, and nurture his children, so it is his right to have their society, their services, and the control of their moral and intellectual training.

At common law, the father had a right to sue for, and receive the money due for the minor's services.

Everett v. Sherfey.

The Code of Iowa has not so far modified the common law rule, as to take away this remedy from the father.

The Code, in establishing a general rule upon the subject, does not negative the father's right to the services of his minor child; but only provides that where the minor has made a contract for his personal services, and received payment therefor, in accordance with the terms of his contract, the parent shall not recover the same from the person so employing the said minor.

The fact that the father has emancipated, banished, or driven his son from home, so that he has lost his remedy against a person for harboring him, may be shown from circumstances, as well as by express proof.

By emancipation, is understood, such act of the father as sets the son free from his subjection, and gives him the capacity of managing his own affairs, as if he was of age.

In the absence of statute, the rule that now obtains is, that such emancipation need not be evidenced by any formal or record act of manumission, but is a question of fact, which may be proved by direct proof, or from circumstances.

Where, in December, 1851, a misunderstanding arose between a parent and his minor child, which resulted in the son's leaving home, and residing and working at various places, before he went into the defendant's service; and where, after said December, 1851, the father did not apparently have or exercise the proper and necessary control and authority over the said minor, and permitted and sanctioned the living out of the said minor at various places, and at different employments, away from home, but who made the contracts, or received the wages, was not shown; and where the father had stated, that he had no control over his son, and had in some instances waived his authority over him; and on the 11th of September, 1852, by publication in a newspaper, forewarned all persons from crediting said son on his account, averring that he would pay no debts of his contracting, and that he would not fulfill any contracts, or pay any debts, entered into by him; and where the minor went to live with the defendant in the spring or summer of 1852, and the defendant admitted in his answer, that in the month of January, 1853, he had notice that the father objected to the defendant employing his son, and was dissatisfied with defendant for retaining him in his service; and where the father, in February, 1853, sued the defendant before a justice of the peace, to recover for the services of the said minor son, in which suit the judgment was for the defendant. *Held*—

1. That there was a manumission or emancipation of the son, up to January, 1853; and that there was no liability for giving the son shelter, residence, and a home, on the part of the defendant.

2. That though the father may have once so far emancipated the son, as that he would have a right to contract for his own services, and seek his own places of employment, yet the father might afterwards assert his control, and have his right of action for a subsequent harboring or retaining in employment, by the defendant.

3. That the defendant was liable for harboring the son, after January, 1853.

*Appeal from the Cedar District Court.*

THIS suit was commenced by Everett against Sherfey, on the 24th September, 1853. The plaintiff's claim is for damages by reason of defendant's having harbored and retained in his employment, one Jonah Everett, the minor son of plaintiff, from May 1st, 1852, to the time of the commencement of this suit.

The answer in substance denies the harboring and retaining, and avers that, if plaintiff was deprived of the care, nurture, education, and services of his son, it was because of his own unjust and cruel acts, and that plaintiff had discarded and banished him from his house; that plaintiff, before and after September, 1852, permitted his said son to act for himself, and that he was in the habit of making his own contracts with plaintiff's knowledge; that he had no knowledge that plaintiff was dissatisfied, until long after he had employed the said Jonah, to wit, in the month of January, 1853, and that from that time, he did nothing more than to furnish the son with board, and pay him for his services. To this, there was a replication in denial of all material allegations.

The cause being submitted to the court, without the intervention of a jury; its decision was reduced to writing, in accordance with section 1793 of the Code. A condensed statement of the facts, is as follows: In the spring or summer of 1852, plaintiff's son, a minor of the age of seventeen, went to reside at defendant's house, and was then and afterwards employed by him as a hired hand for over one year, the defendant paying the son full wages for his services. In February, 1853, plaintiff sued defendant before a justice of the peace, to recover for the services of the said minor, while so employed, in which suit, the judgment was for defendant. The son was of a dissatisfied and roving disposition, careless and improvident in his habits, not under parental control, and either through willfulness or negligence, had not received the education proper for a person of his age and condition. In December, 1851, a misunderstand-

ing arose between the parent and the child, which resulted
in the son's leaving home, and residing and working at vari-
ous places, before he went into the defendant's service.
After said December, 1851, it is stated, that the father did
not apparently have or exercise, the proper and necessary
control and authority over the said minor, that a parent of
a well regulated family ought and should exercise, and that
he permitted and sanctioned the hiring out of said minor at
various places, and at different employments, away from
home, but who made the contracts, or received the pay, is
not stated, nor proven. Defendant did not entice the son
from his home, nor endeavor to alienate his affections; nor
did he prevent his leaving his house and employment at any
time, nor in any manner cheat, defraud, or circumvent him,
or lead him into bad habits. The father had also stated,
that he had no control over his son, and had in some in-
stances waived his authority over him. It also appears, that
on the 11th September, 1852, the plaintiff, by publication
in a newspaper, forewarned all persons from crediting his
said son on his account, avowing also therein that he would
pay no debts of his contracting, and that he would not fulfill
any contracts, or pay debts, entered into by him.

From these facts, the conclusion of the court was as fol-
lows: That the Code has so modified and changed the
common law, as to permit minors to contract for their per-
sonal services, and that when such contracts have been en-
tered into, the services performed, and payment made there-
for, to such minor, they are so far protected by the Code,
that no claim for damages against the person so contracting
with said minor, can be sustained for harboring and retain-
ing him, unless such contract is oppressive and unjust of
itself, or unless the minor was deprived of the means of ac-
quiring an education, suitable to his condition in life; or
unless by the performance of such contract, the morals and
good standing of such minor were endangered: And, that
no evidence had been submitted to show that said employ-
ment was of this character, or had these effects, and therefore
defendant was not liable. On the trial, defendant, against

plaintiff's objection, introduced in evidence a transcript of the proceedings before the justice, before referred to. Plaintiff appeals, and assigns for error: 1st. The admission of said justice's transcript. 2d. That on the facts found, the judgment should have been for plaintiff.

*S. Whicher*, for the appellant.

*J. Scott Richman* and *Cloud & O'Connor*, for the appellee.

WRIGHT, C. J.—Various objections have been urged against the admissibility of the justice's transcript, relating to its form and authenticity. We deem it unnecessary to examine these objections, for we are unable to see how, in any event, these proceedings could affect either party's rights in this suit. This testimony, in our view, was simply immaterial, and the judgment herein, was either right or wrong, without reference to, and independent of it. If the conclusion of the court below is correct, it would have been equally so, if this transcript had been excluded. And while we are unable to see the materiality or applicability of this testimony, yet as we do not see how either party could be prejudiced, as the case now stands, we should not on this assignment, reverse this judgment.

That the father has a right to the care and custody of his minor children, and to superintend their education and nurture, is a proposition that does not admit of controversy. And where he is deprived of such care and custody, and of this superintendence, by the act of another, he has his remedy, by proper action, against such person, is equally clear. As it is the duty of the father, to educate, protect and nurture his children, so it is his right to have their society, their services, and the control of their moral and intellectual training. These rights and duties are co-relative; and it is conceded by defendant, that plaintiff must maintain his action, unless the common law has been so modified and changed by the Code, or the facts, as found, show that there was such emancipation of the son, as to deprive the father of such remedy. We do not regard that the Code has so

far modified the common law rule, as to take away this remedy. At common law, the father had a right to sue for, and receive the money due for, the minor's services. He was entitled to it, the same as that due for his own services. This rule operated, perhaps, unjustly, in many instances; and the Code, in establishing a general rule upon this subject, does not negative the father's right to such services, but only provides, that when the minor has made a contract for his personal services, and received payment therefor, in accordance with the terms of his contract, the parent shall not recover the same from the person so employing the said minor. Whether this rule is more just and equitable than that at common law, is not for us to say. The Code has now established this as the modified rule, and that is sufficient. But this does not change the right of the father to the care, custody, nurture and education of his minor child, if he shall so desire. The language of the law does not deprive him of such right; and unless such necessary and conceded right and control, was clearly inhibited, we should not, by implication, deprive him of it. To so hold, would be in effect to make the control of the father, dependent upon the whim and caprice of the wild and evil disposed son. That this was the design, is derivable neither from the letter, spirit, nor context of the Code.

Had the father, in this case, then emancipated, banished, or driven his son from his home, so that he had lost his remedy against the defendant for harboring him? This emancipation, or abandonment of his right to control, may be shown from circumstances, as well as from express proof. Whether there is such express proof, or such circumstances, as will justify such conclusion, must be determined from the facts found by the court, and the allegations admitted, if any, by the pleadings. There could be no such harboring as would render the defendant liable to the father, in this action, if the son was, in truth, emancipated. And if the son was not emancipated, it will still be a question whether there was such harboring, as renders the defendant liable. By emancipation, in this connection, we understand, such act

of the father, as sets the son free from his subjection, and gives him the capacity of managing his own affairs; as if he was of age.    This emancipation, or enfranchisement, was formerly done by the formality of an imaginary sale.    This was subsequently abolished, and the simple process of manumission before a magistrate, substituted.    Inst. 1, 2, 6.    In some states, as in Louisiana, such emancipation is expressly regulated and recognized by statute.    In the absence of statute, the rule that now obtains, is, that such emancipation need not be evidenced by any formal, or record act of manumission, but is a question of fact, which may be proved by direct proof, or from circumstances.    *Canovar* v. *Cooper*, 3 Barb. 115; *Whiting* v. *Earle & Harrod*, 3 Pick. 201; *Benson* v. *Remington*, 2 Mass. 115; *Woodell* v. *Coggershall*, 2 Metc. 89; *Stansberry* v. *Bertron*, 7 Watts & Serg. 362.

From the facts found by the court below, do we believe there was error in holding there was such an emancipation ? We have carefully examined this finding, and conclude, that the court was justified in sustaining such emancipation, from all the facts and circumstances, up to January, 1853. Previous to that time, it appears the son had hired to other persons, and that the father permitted and sanctioned the same.    Until that time, there is nothing to show that the father objected to such hiring, after their disagreement in December, 1851.    It is expressly stated, that the defendant did not entice the son into his service, nor, up to that time, detain him, contrary to the will and wish of the father. From these circumstances, to mention none others, we think the court might fairly conclude, there was a manumission, or emancipation, up to the time above stated, and that there was no liability for giving the son shelter, residence, and a home.    At least, we think it so fairly deducible from the facts, that we should not disturb the conclusion.    In speaking of the want of objection on the part of the father, however, we do not wish to be understood as holding, that the defendant should have notice of the father's objection, before he would be liable for harboring the plaintiff's son. But we think that the assent of the father to such hiring,

could be fairly implied up to that time; and the defendant was, so far, not liable.

In his answer, however, defendant admits, that in the month of January, 1853, he had notice that the father objected to his employing the said minor, and was dissatisfied with him (defendant) for retaining him in his custody. Now, though the father may have once so far emancipated his son, as that he would have a right to contract for his own services, and seek his own places of employment, yet the father might afterwards assert his control, and have his right of action for a subsequent harboring or retaining in employment by the defendant. True, the defendant says, that after that time, he exercised no other control over the son, than to furnish him with his board, and to pay him for his labor. This, we suppose, was all he did at any time. It is not probable that he actually secreted the son, or secured or harbored him, as we speak of harboring or secreting those who have violated the law. Neither is it necessary, that he should have done so, in order to make him liable. It was the absolute right of the father, to have the society, services, and care of his son, unless he had forfeited the same, of which we have no evidence. If he was of a roving and wild disposition, there was so much the greater necessity that he should be subject to parental control, and that the defendant should inhibit him his house, and thus tend to constrain him to return to his proper abode. Neither was it necessary that such contract should be oppressive and unjust, or that the son should be deprived of the means of acquiring an education, or that his morals should be injured, before the defendant would be liable. The father has the right to judge as to what are proper contracts—what the education should be—and what the moral training. Is he unfit for this duty, or does he abuse this most sacred trust, there is a method provided for remedying the evil. But no individual has a right to interpose and assume such control, and claim that the father is not giving his child a proper education, and deprive him of his services, and become his guardian and protector. If this was the correct rule, there would be few, if

any instances, perhaps, where there would be a liability for harboring minor children, or where the father might not with impunity, be deprived of their society and services.

After January, 1853, then, we think, the defendant was liable for harboring this child, and the court below should have so found. We can find no case that goes so far as to excuse the defendant, when he has notice, and still retains the minor in his employment. It was his duty after that, at least, to have refused him a residence and employment. By so doing, he might have been induced and constrained to return to his proper filial obedience, and become subject to the admonition of a father, whom he had left, perhaps, from willfulness and a spirit of insubordination. This, it was no right or duty of the defendant to encourage, either actively or passively. Were it otherwise, the father might be prejudiced to an indefinite extent, by an imprudent son, or the unwarranted interference of strangers, with the rights, duties, and privileges of the parent. This was not contemplated by the Code. See on this subject, 2 Kent, 192; Reeve on Domestic Relations, 293; 1 Black. Com. 453; *Commonwealth* v. *Natt*, 1 Browne, 143; *Shute* v. *Dorr*, 5 Wend. 204; *Plummer* v. *Webb*, 4 Maine, 380; *Keene* v. *Sprague*, 3 Maine, 73.

Judgment reversed.