.J. H. BRISTOR v. CHICAGO & NORTHWESTERN RAILWAY CO.,
Appellant.

Parent and child: EMANCIPATION: EVIDENCE. A father's emanci-
pation of his minor son may be in writing or by parol, and
may be proved by circumstantial·evidence or implied from con-
.duct. Evidence reviewed and held to require submission of
the question of emancipation.

*Appeal from Sioux District Court.* — HON. GEORGE W.
WAKEFIELD, Judge.

THURSDAY, JULY 13, 1905.

ACTION to recover the value of horses lost in trans-
-portation. Judgment against defendant, from which it ap-
peals. — *Reversed.*

*James C. Davis, Clark & McLaughlin,* and *J. H. Hutch-
inson,* for appellant.

No appearance for appellee.

LADD, J. — A car was loaded on defendant's line of
railway at Iroquois, S. D., in February, 1903. Household
furniture and farm machinery were placed in one end on a
platform about twenty inches high, and forty pigs put in
under it. · At the other end six horses were hitched cross-
ways, boxed piano, with bed springs above, in front of them.
Two colts were loose in the space between the doors, but
with the pigs, could run in where the horses were. It was
billed via Hawarden to Des Moines over defendant's road,
and from there to Chariton over the C. B. & Q. line, the
contract being signed by the shipper as " P. R. & J. H.
Bristor." The plaintiff was given transportation in consid-

eration of loading, feeding, watering, and caring for the stock. Before reaching Hurley, S. D., some of the horses had gotten down, so that it was necessary to unload them. The car was picked up by the next train, and reached Hawarden at seven minutes after 5 o'clock in the morning, according to the testimony of the conductor, or 1½ hours before daylight as testified by plaintiff. Here the train was side-tracked until 8 o'clock a. m., when it was to leave in charge of another conductor. Shortly after the car reached Hawarden, the plaintiff, and also his son, who had ridden in it without permission of the company as a stowaway, heard a noise in the other end, and upon looking discovered that some of the horses were down again. Plaintiff testified that he immediately requested the man at the depot to have the car set at the chute so that it could be unloaded, but did not remember the man, or whether he said anything, and that upon returning to the car he heard his son ask the conductor if he would run the car to the chute, and the conductor's reply that: "We are not birds. We cannot fly. We will put you there when we get ready." This was confirmed by the son, and the evidence of both was to the effect that the car was not placed at the chute until an hour and one-half later, when four horses and one colt were found dead. The plaintiff has sued for the value of these animals in his own right, and the court instructed that they belonged to him. Appellant contends that three of them were owned by his son, P. R. Bristor, or at least that the question of plaintiff's ownership should have been submitted to the jury. The son was nearly twenty-one years old at the time of the loss, and testified that after the carcasses had been unloaded he told his father to take them; that they were no good to him; but that prior to that time he had claimed them, and called them his. As the action is not for the carcasses, but reducing the live horses to that condition, the pretended transfer requires no attention. The plaintiff testified that his son had claimed the horses.

I never disputed him in it at all.   He was a good boy, and a good boy to work, and he did work around some, and got that team.   Of course, he was a minor, but I allowed him to claim them as his.   I allowed him to work, collect his own wages, and he worked a while and got his team. I allowed him to expend his earnings in the purchase of these horses, and made no objections to it.   I allowed him to claim them.   He treated them as his own.   Q. They were regarded by you as belonging to your son, P. R. Bristor? A. I allowed him to call them his.   Q. You regarded them as his, didn't you?   A. I calculated to as long as he took care of them and not fool them away.   I allowed him to expend the money that he earned in working as he saw fit, when he wanted to get the horses.   He talked with me about buying the horses, and then went and bought them.   I was not present at the time.   He bought the three probably.   The three that he bought were the 1,300 pound horse, the 1,100 pound and 1,050 pound.   Q. Then three of the horses that you found dead at Hawarden were the horses that were owned by your son, P. R. Bristor?   A. Yes, sir.   He owned one of the colts, but not the colt that was killed.   He did not have any interest in any of the other horses.   My son, P. R. Bristor, was twenty-one years old last August.   He worked out one summer, and collected his own wages.   That was two or three years ago.   He worked some by the day, whenever he could get away from home.   He farmed on his own account up in Dakota with these horses; farmed in the neighborhood of forty acres.   He disposed of 100 bushels of wheat, or such a matter, that he grew.   I could not say whether he used the money to suit himself or not, but, so far as I know, he did.   I have four boys besides P. R. Bristor.   They did the farming in Dakota.   I devoted most of my time to working at the carpenter's trade.   Q. When you unloaded them you found there was five of them dead — one colt and four horses?   A. Yes, sir.   Q. Three of the horses were horses belonging to your son?   A. Yes, sir.

That a father is entitled to the services of his children during minority is not questioned, nor can his right to relinquish his claim to such services and allow the minor to earn money for himself and receive and appropriate his own earnings at his pleasure.   In other words the father

may emancipate his son, and put him on the same footing as to his services as if he had already attained the age of twenty-one years.   Such emancipation may be by parol or in writing, and may be proven by circumstantial evidence or implied from the conduct of the parties.   *Everett v. Sherfey,* 1 Iowa, 356; *Wolcott v. Rickey,* 22 Iowa, 171; *Bener v. Edgington,* 76 Iowa, 106; *Kubic v. Zembe,* 106 Iowa, 269; *Halliday v. Miller,* 29 W. Va. 424 (1 S. E. 821, 6 Am. St. Rep. 653); *Flynn v. Baisley,* 35 Or. 268 (57 Pac. 908, 45 L. R. A. 645, 76 Am.. St. Rep. 495).   Quoting from *Porter v. Powell,* 79 Iowa, 151:

To emancipate is to release; to set free.   It need not be evidenced by any formal or required act.   It may be proven by direct proof or by circumstances.   To free a child for all the period of minority, from. care, custody, control, and service, would be a general emancipation; but to free him from only a part of the period of minority, or from only a part of the parent's rights, would be limited.   The parent, having the several rights of care, custody, control, and service during minority, may surely release from either without waiving his right to the other, or for a part of the time without waiving as to the whole.   A father frees his son from services.   That does not waive the right to care, custody, and control, so far as the same can be exercised consistently with the right waived.

The mere fact that the son continued to make his home with the father, and continued to assist him somewhat about his farm work, is not controlling.   This merely strengthened the presumption that his services belonged to his father, which obtains as to all minors.   Notwithstanding this, however, proof was admissible to show that all claim to his earnings and property acquired therewith had been relinquished by the father.   " The emancipation from the father's control may be as perfect when both parties live together under the same roof as if they were separated.   The father's renunciation of all legal right to the son's labor is not less absolute

because other family ties continue unbroken." *McCloskey v. Cyphert,* 27 Pa. 220. The son was nearly of age. He had been allowed to work and collect wages as his own, and with them to purchase these horses. He had used them in farming on his own account. The father's oversight doubtless was exercised in the paternal spirit for the protection of the son's interest, and not because of any claim to the property or the earnings of the son with or without its use. True, the plaintiff's answers are not as definite as they might have, been concerning his intention, for he refers to the horses as belonging to his son, and yet repeatedly states somewhat equivocately that he allowed him to claim them. But the names of both were attached to the shipping contract, and the son handled them as his own property. We think the evidence such that the issue as to whether the son had been emancipated with respect to his earnings and acquired this property as his own should have been submitted to the jury.

Other questions are argued, but as we are not aided by a brief in behalf of the appellee we deem it advisable to defer their consideration. — *Reversed.*