PATEK, Appellant, vs. PLANKINTON PACKING COMPANY, Respondent, and ALFRED PATEK, interpleaded, Defendant.

*November 9, 1922—February 6, 1923.*

*Parent and child: Right to earnings of minor: Action to recover earnings paid minor: Emancipation: Express or implied: Agency of wife: Questions for jury: Interpleading minor: Discretion of court: Harmless error.*

1. A parent is entitled to the services and earnings of his minor child, but he may waive or relinquish such right by such ill treatment or abuse that the child is practically driven away, by leading such an immoral and dissolute life that it would be improper and unsafe for the child to live under such surroundings, by failing to give proper support when able to do so, or by voluntary surrender of such right.

2. Where the law permits the marriage of minors, parental authority must yield to the new obligations and rights arising from the marital obligation.

3. The parent impliedly surrenders his right to the services and earnings of his minor child where the parent's conduct after the child leaves home is wholly inconsistent with the assertion of the parental right.

4. Implied emancipation may be inferred from such circumstances and conduct on the part of the parent as reasonably

lead to the conclusion that he expects the child to provide for himself with no accounting to the parent for his earnings.

5. Even at common law, although a married woman could not make contracts to the extent that she now may, she could act as the agent of her husband in making contracts in certain cases, and her authority as agent might be express or implied.

6. While it is not ordinarily within the scope of the implied agency of the wife to emancipate the children of the marriage, under the peculiar and unusual facts of this case, which was brought by the father to recover wages paid to his infant son, the question whether the mother had given the boy to understand that he might shift for himself and therefore impliedly surrendered the right to his earnings is for the jury.

7. In such case, the question whether the father, by permitting the employer to pay the son his wages, ratified the action of the mother in surrendering her parental right to the son's earnings is for the jury.

8. It was within the sound discretion of the trial court to permit the employer to interplead the son and file a cross-complaint to recover from the son any amount found due the parent from the employer, on the ground that the money was paid the son through a mistake of fact.

9. The admission of statements as to the attitude of one party toward another was harmless where such attitude was otherwise in evidence.

APPEAL from a judgment of the circuit court for Milwaukee county: GUSTAVE G. GEHRZ, Circuit Judge. *Affirmed.*

Action by a father to recover from the *Plankinton Packing Company* $3,583.54, the amount of the wages earned by and paid to a minor son of plaintiff between October 1, 1917, and November 6, 1920, the date on which the son attained his majority.

The answer admitted the employment and the amount earned, and alleged that the minor, *Alfred Patek,* had been emancipated by his father. Upon affidavit of the company *Alfred Patek* was joined as a party defendant and a cross-complaint filed against him by the defendant company, which prayed that in the event judgment was rendered

against the company judgment should be rendered against *Alfred Patek* in favor of the company. The cross-complaint was allowed to be filed over the objection of plaintiff's counsel.

*Alfred Patek* was one of six children and lived at home with his parents until September, 1917. For some months prior to this time he had been in the employ of the company and had customarily given his wages to his mother. In addition to providing for his necessities the parents gave him a varying amount of money each week to spend as he saw fit. In September, 1917, the mother went to New York to visit relatives, and during her absence of three months, according to her instructions, *Alfred* paid $6 a week to the housekeeper and kept the remainder of his wages.

Shortly after her return *Alfred* offered her $6 in payment of his board for the previous week. The mother refused to accept this and stated that she wanted the whole of the check. *Alfred* refused to comply with her demand, and as a result of the argument which ensued *Alfred* left the home and went to live with another family. The circumstances of his departure are in dispute, *Alfred* testifying that he was told to look for board elsewhere, and his brother stating that *Alfred* pushed his mother from in front of the door in order to get out.

*Hugo Patek,* the plaintiff, was employed as a traveling salesman and was at home only at the end of each week. Upon his first return after *Alfred* had left he consulted the probation officer and later went to see an official of the company. He requested that his son's check be sent to him. Upon refusal of the official to promise this he asked that his son be discharged so that he would return home. This request was also refused. On October 10th the father sent the following letter to the company:

"Please deliver to bearer the salary of *Alfred Patek,* a minor in your employ, and oblige. Yours respectfully,
        "Hugo Patek, Father."

The following reply was sent back:

"Until the question of the ownership of the wages now due *Alfred Patek* and held by us is determined and the payment directed and authorized by the court, we would not be justified in releasing or surrendering them to either claimant.   Yours truly,
                         "PLANKINTON PACKING COMPANY,
                                    "C. R. P."

A few days later, in a replevin suit brought by J. H. Platt as the next friend of *Alfred Patek* against the company, it was determined that two checks held by the company should be paid to *Alfred*.   The plaintiff was not a party to this suit and had no knowledge of it until a week after its termination.

In December, 1917, *Alfred* went to the home of his parents to visit his brother who was about to enter the army. His father was there but did not speak to *Alfred*.   It appears that thereafter *Alfred* came to the home very frequently and was on good terms with all of the family except the father, who never spoke to him.   On one occasion he stayed for dinner when the father was present but neither spoke to the other.   At the trial the father testified that he wanted his son to come back home, but that he never spoke to him because he thought it was not proper for him to speak first.

In a special verdict the jury found that at the time the company delivered the two checks in pursuance of the court's order in October, 1917, *Alfred Patek* was in a state of emancipation; that had *Alfred* been at home during the period in question the father would have had to spend $3,083 for his support and maintenance; that during the period Alfred had spent for necessaries the sum of $3,083; and that the company in paying the wages acted in reliance on the conduct of plaintiff.

Judgment was entered dismissing the complaint.

For the appellant there was a brief by *Charles E. Hammersley,* attorney, and *John S. Barry,* of counsel, both of Milwaukee, and oral argument by *Mr. Barry.*

For the respondent *Plankinton Packing Company* there was a brief by *Quarles, Spence & Quarles,* attorneys, and *Arthur B. Doe* and *Kenneth P. Grubb,* of counsel, all of Milwaukee, and oral argument by *Mr. Doe.*

For the respondent *Alfred Patek* there was a brief by *Brennan & Lucas* of Milwaukee, and oral argument by *Martin J. Brennan.*

The following opinion was filed December 5, 1922:

JONES, J. The rule which prevailed in China and other oriental countries that the father had almost unlimited control over the destinies of his children before and after majority never found a place in the law of England. Nevertheless the right of the father to the custody and earnings of his minor children was so strictly enforced by the common law that there is hardly any mention of the emancipation of children in the English Reports. In this respect the courts of this country have not followed the common law and they have dealt with the subject of emancipation of minors with some liberty. 20 Ruling Case Law, 609.

While there is no doubt that the parent is entitled to the services and earnings of a minor child, this right may be waived or relinquished in various ways; for example, by such ill treatment or abuse that the child is practically driven away; by leading such an immoral and dissolute life that it would be improper and unsafe for the child to live under such surroundings; by failing to give proper support when able to do so. Under such circumstances there may be emancipation by operation of law. By the weight of authority, where the law permits the marriage of minors parental authority must yield to the new obligations and

rights arising from the marital relation.    20 Ruling Case Law, 612.

Another well recognized mode of relinquishing the parental right to the earnings of a child is the voluntary surrender of such right.   This may be by express agreement, as where by arrangement between parent and child it is agreed that the latter, being able to provide for himself, may have his earnings to use as he may see fit.   There is implied emancipation where, although no express agreement exists, the conduct of the parent after the child leaves home is wholly inconsistent with the assertion of the parental right.

Implied emancipation may be inferred from such circumstances and conduct on the part of the parent as reasonably lead to the conclusion that he expects the child to provide for himself with no accounting to the parent for his earnings.   In the case at bar there is no evidence that the plaintiff personally ever made any express agreement with his son to emancipate him, and the emancipation, if any, must be implied from the facts proved.

It appears from the evidence that the mother, before the transactions now involved, had charge of the financial affairs of *Alfred*.   She had collected his wages and bought his clothing, as plaintiff knew.   Before going away for several months she authorized, not the plaintiff, but the housekeeper, to receive payment for *Alfred's* board and permitted him to retain the rest of his wages.   Different conclusions might be drawn from the testimony which related to the transaction between *Alfred* and his mother when they separated after her return.   On the one hand, it might be inferred that she was unwilling to have him leave the parental roof; on the other hand, that she gave him to understand that he might shift for himself.   This was a matter for the jury to decide under the circumstances.

Even at common law, although a married woman could

not make contracts to the extent that she now may, she could act as the agent of her husband in making contracts in certain cases, and her authority as agent might be express or implied. *Chunot v. Larson,* 43 Wis. 536; *Savage v. Davis,* 18 Wis. 608; 1 Schouler, Dom. Rel. (6th ed.) §§ 135, 136.

No precedent has been cited, and we have found none, expressly holding that a wife might have the implied authority to emancipate a child during the absence of her husband. In the earlier stages of our jurisprudence it might have been a startling proposition that under any combination of circumstances a wife, acting as agent, could grant such emancipation · without express authority given by the father. But in these days when the rights and powers of married women are so rapidly increasing, the proposition would create less surprise. In the present case the jury were instructed on this subject as follows:

" 'Emancipation' is the act by which he who is not free, but is under the control of another, is set at liberty, and made his own master. In the case of a minor child emancipation is the release of the child from his duty to serve the parent. It is the setting free of the child from the care, custody, control, and service of the father. In this respect, acts of the plaintiff's wife, if done by his direction or authority, and within the scope thereof, or if subsequently approved or ratified by him, are the acts of the plaintiff."

Whether or not a wife is her husband's agent is a question. of fact for the jury under proper instructions. This court has said:

"A wife may undoubtedly act as the agent of her husband and in that character transact his business, control his property, and make contracts in respect to it which will bind him. This agency, its nature and extent, and whether it includes the particular contract, may, as in other cases, be inferred from a variety of circumstances. It is a question for the jury to determine from all the evidence whether the wife had authority to do the act or make the contract in question, or whether her act, unauthorized at the time

of its performance, was rendered valid by a subsequent ratification by the husband." *Savage v. Davis,* 18 Wis. 608, 612, 613.

Undoubtedly cases have often arisen where the acts of a wife claimed to be acts of agency for her husband were so palpably beyond the scope of agency that they were so declared by the court. We are by no means holding that it is ordinarily within the scope of the implied agency of the wife to emancipate the children of the marriage. But we do consider that under the very peculiar and unusual facts of this case, including the facts relied on for ratification, it was proper to submit the question of emancipation to the jury.

But defendant's counsel do not rely merely on their claim that the action of the mother when *Alfred* left home effected his emancipation. They claim that her action was ratified by the plaintiff. On his learning of the occurrence, the subject was discussed with his wife and he made no objection to what she had said and done when *Alfred* left the home. Subsequently he made claim for two weeks wages by letter, but the testimony shows that neither then nor afterward did he make any claim for future earnings. Although he soon knew that a judgment had been rendered requiring defendant to deliver the checks for past earnings to *Alfred,* and although he knew for over three years that *Alfred* was receiving his earnings from defendant and supporting himself, he made no objection to *Alfred* or defendant.

Although *Alfred* had friendly relations with his mother and other members of the family and often went with his friends to the house, the plaintiff conversed with the visitors but ignored his son. He did not speak to him when they met on the streets. Plaintiff's attitude toward his son is illustrated by the following extract from his cross-examination:

"*Q.* What did you do about it? *A.* I could not do anything. What could I do? The boy left home. What I should have done was to have taken a club and got him.

"*Q.* Yes. That was the way you felt about it at the time; is that right? You thought he could be handled with a club, didn't you? *A.* He needed it.

"*Q.* And he has needed it ever since? *A.* And he has needed it ever since.

"*Q.* And you still feel the same way about it? *A.* No, he is beyond me now. He is of age.

"*Q.* He is twenty-one. Is that your son sitting in the middle of those three boys? *A.* Yes.

"*Q.* Have you spoken to him in the court room? *A.* No.

"*Q.* Why not? *A.* He has to come to me and speak to me.

"*Q.* If he does not get down on his knees to you, you will never speak to him? *A.* No. He has hurt me too much."

The jury doubtless believed this frame of mind existed when the two pay checks were delivered to *Alfred* and continued until the trial. They probably believed that this hostility and false and unnatural pride on the part of the father made it practically impossible that the former relations should be resumed; and that *Alfred* was expected to provide for himself. We cannot say that the jury were not justified in believing *Alfred's* testimony as to what occurred at the time of his leaving home and that plaintiff had acquiesced in and ratified his wife's action.

Counsel for plaintiff argue that there was no evidence to sustain the finding of the jury that defendant in paying the wages to *Alfred* relied on the conduct of plaintiff. With this view we cannot agree. Plaintiff learned that defendant would not pay him the wages already due until the court determined whether they should be paid to him or to *Alfred*. On or about November 1, 1917, he knew that judgment had been rendered directing the pay checks to be delivered to *Alfred*. During the long period which ensued he knew that *Alfred* was working for defendant, being paid by defendant, and supporting himself. He made no demand for payment to him except the one already referred to. It is not probable that defendant would have continued.

the payments for so long a time except on the belief that plaintiff had waived any claim to them. They doubtless supposed that the judgment had settled the question. In this they were mistaken, since plaintiff had not been made a party to the suit. Nevertheless it was a circumstance which, in connection with all the other facts, the jury had a right to consider in answering this question.

As early as the latter part of October, 1917, plaintiff sought legal advice. In common justice and fairness he was not justified in acquiescing by his silence until more than $3,500 had been paid his son and then demanding that it be paid again, although he had remained more than indifferent to his son and had contributed nothing to his support. All these facts were before the jury and they doubtless came to the conclusion that by the combined conduct of plaintiff and his wife *Alfred* was emancipated; that the plaintiff had waived his right to the earnings, and that the conduct of the plaintiff was such that the defendant had the right to so conclude; and we cannot say that there was no credible evidence to support their verdict. All the facts relating to the emancipation were before the jury and it was a question of fact for them to decide. *Grotjan v. Rice,* 124 Wis. 253, 102 N. W. 551; *Taubert v. Taubert,* 103 Minn. 247, 114 N. W. 763; *Bristor v. C. & N. W. R. Co.* 128 Iowa, 479, 104 N. W. 487.

It is one of the assignments of error that the court improperly allowed *Alfred* to be interpleaded. It was alleged in the cross-complaint of defendant, among other things, that when the sums were paid to *Alfred* defendant believed that he had been emancipated and abandoned by plaintiff and that he had neglected and refused to provide for his son, and that if the plaintiff should prevail the sums so paid were due from *Alfred.* It is argued that the pleadings showed that the payments were made under a mistake of law merely and hence were not recoverable by defendant. It is our view that on the theory of the cross-complaint the

mistake, if any, was of fact and not of law, and that grant-
ing the application for interpleader was within the sound
discretion of the court. *Bakula v. Schwab,* 167 Wis. 546,
168 N. W. 378.

Plaintiff's counsel except to the admission of the testi-
mony of several witnesses relating to statements made by
Mrs. Patek bearing on the attitude of her husband toward
*Alfred.* In view of the other testimony which shows so
conclusively that attitude, we are satisfied that there was no
prejudicial error in this respect.

Plaintiff's counsel assign as error the refusal to give the
following instruction:

"You are instructed that the judgment said to have been
obtained in the civil court of Milwaukee county at the suit
of *Alfred Patek.* against the defendant *Plankinton Packing
Company* was of no force and effect as determining the
question of the father's right to his son's earnings, and is
not binding upon the father."

As bearing on the issue of emancipation and also on that
of reliance by defendant on the conduct of plaintiff, the jury
were instructed in substance that the judgment in the civil
court did not bind plaintiff, but that in connection with all
the other facts in the case it might be considered, provided
they found that he knew of it and examined the record,
and provided he knew that *Alfred* was being paid his wages
regularly and that the plaintiff had made no further claim
for the wages. Guarded as the charge was, we do not
think there was any error in refusing the instruction re-
quested.

We conclude that the judgment should be affirmed.

*By the Court.*—Judgment affirmed.


The appellant moved for a rehearing.

In support of the motion there was a brief by *Charles E.
Hammersley,* attorney, and *Hammersley, Barry & Torke,*
of counsel, all of Milwaukee, and in opposition thereto a

brief by *Quarles, Spence & Quarles,* attorneys, and *Arthur B. Doe* and *Kenneth P. Grubb,* of counsel, all of Milwaukee.

The motion was denied, with $25 costs, on February 6, 1923.