## Case No. 5,236.

### GARDNER v. SHARP.

[4 Wash. C. C. 609.] [1]

Circuit Court, D. New Jersey. Oct. Term, 1826.

[1] [Reported by Hon. William Cranch, Chief Judge.]

[1] [Originally published from the MSS. of Hon. Bushrod Washington. Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters. Jr., Esq.]

Elmer & Wall and L. H. Stockton, for plaintiff.

R. Stockton and Mr. Jeffers, for defendant.

WASHINGTON, Circuit Justice (charging jury). The first question for the consideration of the jury is, whether this court can take jurisdiction of the cause now under consideration. This depends upon the question, whether the lessor of the plaintiff was a citizen of the state of Pennsylvania, as the declaration avers, at the time this suit was brought; or was a citizen of this state, as the defendant insists. And this is always a mixed question of law and fact. The decision of the former rests with the court; the latter must be determined by the jury.

In reference to the jurisdiction of the courts of the United States, citizenship means domicil—home—permanent residence. When a citizen of one state removes to another, and a question of jurisdiction arises, it must be decided by the quo animo which induced the removal. If it was to remain permanently in the state ·to which he has emigrated, it amounts to a change of domicil and of citizenship. If it was merely for a temporary purpose, he can be considered only as a sojourner in the state to which he has gone. Length of residence, although it may afford evidence of the real intention of the party in changing his place of residence, is not of itself a criterion of change of domicil. If the intention of the party be bona fide to change his domicil, the residence of a day at his new home constitutes him a citizen of the state to which he has removed. If, on the contrary, his removal was accompanied by the animo revertendi, he is considered in law but as a sojourner in the state where he has fixed his temporary residence, although that residence may have continued for years. If the removal be for the purpose ·of giving jurisdiction to the courts of the United States, it is a fraud upon the constitution and laws of the United States; unless it was also accompanied by an intention in the party to change his domicil. For although such a motive, if proved, may subject the good faith of the transaction to suspicion; still it will not be sufficient to prevent the change of citizenship if that was bona fide the intention of the removal, and change of domicile was bona fide. Having laid down these general principles for the information of the jury, it will be for them to apply them to the facts of the case. (Here the judge summed up the evidence in relation to this point.)

We have now come to the merits of the cause, which involves the two following general questions: (1) Has the lessor of the plaintiff shown such a title to the land in controversy, as to entitle him to a verdict? And if he has, then (2) Is his right barred by the act of limitations?

1. The title of the lessor, as deduced by the opening counsel, commences with a deed in the year 1737, from John Champness to John Kyd, for three hundred acres of land, including that in·dispute, then in the possession of Kyd. The will of John Kyd in 1750, by which he derives the land in controversy to his son Isaac, in fee tail. On the 9th of November 1753, Isaac conveyed the same to Joseph Sharp, in fee simple, with general warranty, who entered thereon in the course of that year. Isaac died in the year 1776, leaving a son Ebenezer, his heir at law, and issue in tail. In the year 1777, Ebenezer died, leaving the lessor of the plaintiff, then an infant, his heir at law, and issue in tail. In this chain of title it is manifest that an essential link is wanting, and that is, a grant, or something equivalent thereto, to pass the title out of the proprietors to some person under whom the lessor claims. This was to be effected by warrant and survey duly made and returned, approved by the council of proprietors, and recorded, or by length of possession. Whether the title could pass out of the proprietors by any other mode, need not be decided, as none such was alluded to in this case by the opening counsel. No warrant or survey in favour of any person under whom the lessor claims, has been given in evidence. But a title is asserted under the grant from Lord Berkley to John Fenwick, and sundry conveyances by Fenwick and others, claiming under him, which must now be attended to. Whether Fenwick ever had a title, otherwise than as trustee, to West Jersey, may, at least, admit of a doubt; but supposing his title to have been indisputable, it remains to be seen whether it passed, in respect to the land in dispute, to any person under whom John Kyd claimed. The deeds from Fenwick to his two sons in law, Edward Champness, and Samuel Hedges, and their wives, were for two hundred acres to each, to be taken out of the undivided moiety of New Jersey. These deeds could pass a title to no specific tracts of land until they were surveyed, and no evidence of any such sur-

veys has been given. Neither does it appear to what tract of land the release of Hedges to John Kyd, of the 30th of November 1725, for two hundred acres, applied.

But it is contended by the plaintiff's counsel, that the jury may, and ought, to presume an ancient survey of the lands granted by Fenwick to his sons in law, founded upon those grants. Were it to be admitted that the evidence laid a sufficient ground for such a presumption, it is still open to be rebutted by other evidence, leading to the conclusion that no such survey was made. The following circumstances are now submitted to the consideration of the jury in support of this conclusion:

(1) After a thorough search of the records of the surveyor general's office, from the year 1686, the present surveyor general has deposed that he could find no survey of this land in favour of Fenwick, Edward or John Champness, John Kyd, or any other person, except Joseph Sharp, in the year 1753. He stated that the records in that office did not extend farther back than the year 1686.

(2) The bond of John Champness and Sarah Hall, before mentioned, to John Kyd, given as late as the 12th of October, 1720, affords strong evidence that no survey had then been made: since it obliges the obligor to convey two hundred acres of land, not by metes and bounds, or by any other description, but to be taken out of any part of Fenwick's undivided moiety.

(3) The assignment of Edward Champness to his son John, in the year 1704, (eighteen years after the year 1686,) of his interest in the two hundred acres granted to him by Fenwick, makes no mention of any such survey, and gives no description of the said land by metes and bounds, or otherwise.

(4) By the act of 1719 (Rev. Code, § 11) it is enacted, "that all surveys heretofore made, the certificates whereof are in the hands of any of the inhabitants of the province, or any of the neighbouring provinces, which are not within two years: and that all surveys heretofore made, the certificates whereof are in the hands of the people living beyond seas, which are not, within three years after the publication hereof, duly recorded, either in the recorder's office or in the surveyor general's record of the respective division in which such lands are surveyed; be for ever hereafter void, and of none effect; and any succeeding survey, duly made thereof and recorded, shall be as good and sufficient as if no former survey had been made." This was certainly a very awakening act, and it is to be presumed, would have induced all persons who had surveys of their lands previously made, to have them recorded within the prescribed periods. But admit that a survey of the land prior to 1719, instead of being presumed into existence, were proved by positive evidence. I am at a loss to imagine how the plaintiff could extricate himself from the effect of this law, which declares it to be void for want of being recorded, and gives

validity to the subsequent survey made in 1753, for Joseph Sharp. This difficulty was foreseen by the plaintiff's counsel, and the answer given to it was, that the law can only make void such unrecorded surveys in favour of subsequent surveys, made without notice of such prior unrecorded surveys. Let this for the present be admitted. It may still be asked, what proof has been given that Sharp or the deputy who surveyed the ninety-one acres in 1753, had notice of a survey not now produced, nor evidence given of its existence, but which the jury are now called upon to presume did once exist?

As to a possessory right in John Kyd, or those under whom he claims against the proprietors, none is pretended beyond twenty-eight years, from 1725 to 1753, when Sharp's survey under his warrant was made. This, it is contended by the plaintiff's counsel, is sufficient under the act of 1727, which it is supposed adopts the statute of limitations of 21 Jac. I. of twenty years. But I take this question to be otherwise settled by the supreme court of this state, where it has been decided, that the action of ejectment had always been considered as on the same footing with the writ of right, and that the statute of Jacobus in that respect did not extend to this state. Den v. Pissant, Coxe [1 N. J. Law] 222; Den v. Morris, 2 Halst. [7 N. J. Law] 11.

I do not understand the plaintiff's counsel to have denied that a right by grant, warrant and survey from the proprietors, or length of possession against them, is an essential link in their chain of title. But they deny that it lies in the mouth of the defendant to question the validity of the plaintiff's title, or to set up an adverse paramount one against her; because he is estopped to do either by the deed from Isaac Kyd, which conveyed a fee simple estate in the land in controversy to Joseph Sharp. The answer given to this argument by the defendant's counsel is conclusive. If he is estopped to deny the title of the lessor to this land, because her ancestor, the tenant in tail, granted to Joseph Sharp a fee simple interest in it; she must be estopped to deny the title so conveyed by that deed, since estoppels operate equally and reciprocally. But the fact is, that the doctrine of estoppels has no application to this case. The deed from Isaac Kyd passed a bare fee to Sharp, and both of those parties were estopped to deny that title. But the lessor is neither party or privy to that deed, but a mere stranger, claiming, not under Isaac Kyd, the tenant in tail, but under John Kyd, the donor, per forman doni. She then is not estopped by that deed to assert her title as issue in tail, and consequently the defendant is not estopped to deny her right to the land, or to set up a better title against her. Whether the survey for Sharp in 1753 covers the whole of the land in controversy, may be a question of doubt. One witness has sworn that it does, and another witness that it does not. But if the jury

should be of opinion that the plaintiff has failed in showing a title, this will be an immaterial point in relation to this branch of the cause, since the defect in the title of the lessor will be fatal to her recovery of any part of the land to which she sets up a claim.

2. The next question to be considered is, whether, if the plaintiff has shown a title to the land in dispute, it is barred by either of the acts of limitation? and this may in some measure depend upon the decision of two preliminary questions. (1) When did Joseph Sharp's title under his survey commence? (2) Under what right did he enter?

(1) On the 27th of March, 1753. Jacob Richman, deputy surveyor, having in his possession certain warrants, one thousand acres whereof had been regularly conveyed to Joseph Sharp, entered upon the land in controversy, and surveyed for him ninety-one acres by metes and bounds. This survey, with his report, he returned to the surveyor general, who placed it amongst the files in his office, as was the uniform practice of that department. He adopted the work as his own, after having made some immaterial formal alterations in the report or certificate of his deputy, such as omitting to state the corner trees, and specifying the names of Lambert's legatees, in whose favour the warrants issued. On the 10th of December, 1755, he made a regular certificate of the survey thus amended, and reported to the council of proprietors that by virtue of those warrants, and conveyances from the original warrantees to Sharp, he had caused part thereof to be surveyed for said Sharp by certain metes and bounds, by his deputy, Jacob Richman, containing ninety-one acres. He does not describe Richman's survey by its date, which he omits altogether; but the recitals, the courses and distances, and the beginning, are precisely the same in both reports, and it is admitted by the plaintiff's counsel that they both describe the same identical parcel of land. The survey and report of the deputy surveyor is a regular office paper, belonging to the archives of the surveyor general's office, and is the foundation of the surveyor general's certificate and report to the board of proprietors. The evidence of the surveyor general given in this cause is material. He stated that the date of the survey and report of the deputy is sometimes inserted in the certificate of the surveyor general, and is sometimes omitted. That according to the regular practice of the office the original survey and report of the deputy is put upon the files; for the purpose of being referred to by the surveyor general, to see when the survey was actually made, and to settle priorities of titles, where there are different surveys for the same land. He further stated that it had been, and continued to be, the practice for the surveyor general to alter and correct the report of his deputy, and that the report and certificate of the surveyor general, with these corrections, is

returned to the board of proprietors; and if, after examination, it is there approved, it is ordered to be recorded. The result of all this then is, that the survey of this ninety-one acres of land was duly made on the 27th of March, 1753—was reported to the council of proprietors by the surveyor general on the 10th of December, 1755, and was approved and ordered to be recorded on the 5th of February, 1756. It is admitted on all hands, that the survey passes no title whatever unless it be approved by the council of proprietors and ordered to be recorded. But when this is done, we have the authority of the late Chief Justice Kirkpatrick for saying, that the title relates back to the survey; and this position, upon general principles of law, seems to be incontrovertible. The title then of Joseph Sharp to the ninety-one acres of land, commenced on the 27th of March, 1755.

(2) Under what title did Joseph Sharp enter? One witness, who was but nine years old in the year 1755, has deposed, that he entered under Kyd's title; but this is obviously an inference of the witness from the circumstance of Sharp having received a deed from Isaac Kyd in November 1755, after which he went into actual possession of the land; for he does not state any declarations or acts of Sharp to warrant his conclusion. But be this as it may, and admit that Sharp did not enter until after the date of Isaac Kyd's deed in November 1755. He then entered, having two titles to the land; one prior and indefeasible under his survey, and the other posterior and defeasible after the death of Isaac Kyd. In such a case, the law adjudges that he entered by his paramount and better title; and this entry was adverse to the title of Isaac Kyd.

Now what says the act of limitations? The first section of the act of the 5th of June 1787 [supra] declares, "that sixty years actual possession of any lands, &c. uninterruptedly continued by occupancy, descent, conveyance or otherwise, in whatever way or manner such possession might have been commenced or have been continued, shall vest a full and complete right and title in every actual possessor or occupier of such lands, &c. and shall be a good and sufficient bar to all claims that may be made or actions commenced by any person whatever for the recovery of such lands." It is not to be questioned that Joseph Sharp and those claiming under him, have had upwards of sixty years' actual possession of the land from the year 1753 to the institution of this suit. The case is equally clear against the plaintiff, under the second section of this act; which declares that thirty years' actual possession of any lands, &c. uninterruptedly continued as aforesaid, wherever such possession commenced or is founded upon a proprietary right duly laid thereon, and recorded in the surveyor general's office of the division in which such location was made, or in the secretary's office, agreeably to law, &c. shall be a good and sufficient bar to

all prior locations, rights, titles, conveyances or claims whatever, not followed by actual possession as aforesaid, and shall vest an absolute right and title in the actual possessor and occupier of all such lands, &c. This act has the usual savings in favour of infants, femes covert, persons non compos, or without the United States at the time the said right or title first descended or accrued; who are allowed to bring their actions within five years after the removal of these disabilities. Under this section, it is quite immaterial whether Joseph Sharp entered under Kyd's title or not, or whether his title under the survey commenced in 1753 or 1755; for in the latter case, having a good title under his survey, his possession was founded upon a proprietary right, duly laid on the land, and recorded in the surveyor general's office, &c. although it might not have commenced upon such right. This possession began to run in 1776, adversely to Ebenezer Kyd, and consequently ran over all the subsequent disabilities of the lessor of the plaintiff, and so continued for more than thirty years before the bringing of this suit.

The jury found for the defendant.