THE INHABITANTS OF JEFFERSON, Plaintiffs in Error, *versus* THE INHABITANTS OF WASHINGTON.

In an adjudication of a Judge of the Court of Common Pleas, rendered on a complaint originally filed under the statute providing for the settlement and support of the poor, as in a special verdict, they being placed by the legislature upon the same footing, this Court will only notice such facts as are specially found in such adjudication or verdict.

The word settlement, in reference to a pauper, means that such individual has, in case of need, a right to support from the inhabitants of the town where his settlement may be.

Dwellingplace, or home, means some permanent abode or residence, with intention to remain; and is not synonymous with domicil, as used in international law, but has a more limited and restricted meaning.

An individual, abandoning his home or dwellinghouse, with or without design of acquiring one elsewhere, has no home by construction, in the place abandoned.

A home, or dwellingplace, does not continue till another is gained; it may be abandoned, and the individual cease to have any home.

THIS was a writ of error to reverse a judgment of the Court of Common Pleas.

The facts upon which the judgment sought to be reversed was rendered, appear in the report and adjudication of REDINGTON J., which was as follows:—

This is a complaint made before a justice of the peace, by the overseers of the poor of Washington, to recover the expenses incurred by them in the support of one Nathaniel Place, a pauper, whose legal settlement is alleged to be in Jefferson, and also to procure his removal.

It was admitted, that the pauper fell into distress in Washington, and was supplied with necessary relief by the complainants. It was further admitted, that the proper notice and reply were seasonably given, but it was denied that the settlement of the pauper was in Jefferson, when the supplies were furnished.

A commissioner was appointed to take the evidence. His report is very voluminous, containing the testimony of nearly one hundred witnesses. By this testimony, in connexion with several depositions, it is proved, that the pauper was born in

what is now Wiscasset, several years before the revolutionary war. His father died at that place, sixty-two years ago, being the owner and in possession of real estate in that place.

Soon afterwards, the pauper, at the age of fifteen years, went to what is now Alna, where he resided six years, within which time he learned the shoe-making trade, and then worked one year on his own account. At the end of that year, he departed from Alna, and went to Balltown plantation, which now comprises Jefferson and two other towns. After saunter-ing about for some time, without any home, he hired a small strip of land in what is now Jefferson, which he cultivated, though quite negligently, about two years, between 1797 and 1802, living at the same time within what is now Jefferson. From this fact, it is considered to be proved, that he there ac-quired a residence, and had his home in that part of the plan-tation now Jefferson.

In 1802, he left that home, and from that time till 1810, (within which period, viz. on the —— day of February, 1807, the town of Jefferson was incorporated,) he was habitually roving from house to house, and frequently from town to town, with his little wallet of tools to do shoe-making work, as he happened to be sent for, or could find employment, carrying a little jug in which to get his pay; eating his food where he happened to work, or where the hand of charity supplied it, and often failing to get his regular meals. Where night came down upon him, there he lodged. Measuring the circuit of his ramblings, the central point would fall within the limits of Jefferson. In that town, around the head of the pond, he loitered and spent much more of his time than in all other places, attracted especially by a couple of drunkeries located there. But while thus lingering about these fountains of "blue ruin," or roving from place to place, often drawn back, by the allurements of rum, to his favorite haunts at the head of the pond, poor Nat Place knew no spot, except, perhaps, in the public highway, where he had any right to deposit himself, his jug, or his pegging awl, except by indulgence of others, from hour to hour. There were two families in Jefferson, who were

particularly kind to him. In one of those families he had an aunt. They permitted him to be frequently at their tables, sometimes for several days, perhaps weeks together. He occupied no shop nor land, never contracted or paid for any board, had no trunk nor chest. His second shirt, when he had such a thing, he sometimes washed at the brook, but more frequently got it done in these families. He was occasionally incited to work a day or two, for the persons upon whose families he had been so much a burden. Though not taxed in the books, he worked out a poll-tax on the highways in Jefferson, two or three years, thinking he was bound to do it.

By these facts, it is considered to be proved, that from 1802 to 1810, Place had no residence or dwellingplace in Jefferson, unless constructively, from the domicil which he had previously acquired in the plantation as above mentioned.

In 1811, he was taxed in Jefferson to state, county and town taxes. A tax of some kind was also assessed upon him in 1812. Between 1810 and 1816, he took up without right, a small lot of land in that town — fenced it and raised crops upon it two seasons; upon this spot he erected a coarse cheap camp, having a rude fire place. In that camp he sometimes lodged and took his meals, and was occasionally favored by night and by day, with the society of some of his old fellow sufferers in the cause of rum. Over this apology for a house he exercised dominion, it was under his own control, nobody was known to claim any rights above him, and here he had a right to deposit himself. It is considered as proved, that by reason of possessing, cultivating and camping upon that lot, taken in connexion with the taxing aforesaid, that he there acquired an *actual* residence and a home at sometime between 1810 and 1816.

As early as 1816, his vagrant habits were resumed, his camp was torn down, and he never afterwards had any *actual* home in any place. In 1819, he made a parol sale of his supposed claim in his camp ground for fifty cents; and it was not satisfactorily proved where he was on the 21st March, 1821. Upon the foregoing evidence it is considered by the Court that

at the time of furnishing the supplies aforesaid, the legal settlement of the pauper was in Jefferson, and that the complainants recover against said town of Jefferson, the amount of supplies furnished to the pauper up to the second day of May, 1838, being two hundred and twelve dollars and sixty-one cents, together with legal costs, and that said Place be removed to said town of Jefferson.

Very elaborate written arguments were furnished the Court.

*Mellen*, for the plaintiffs in error. The pauper gained no settlement under the act of March 21, 1821. The facts, upon which the decision sought to be reversed rests, took place prior to that time and subsequently to Feb. 11, 1794, when the statute of Massachusetts, which prescribes what shall constitute a legal settlement was passed. The act of Massachusetts remained in force until 1821. Whatever settlement the pauper gained was under the act of Feb. 11, 1794. By that act twelve modes of gaining a settlement were designated, none of which apply to the present case.

The decision of the Court below, " that the pauper acquired a residence and had his home in Jefferson," amounts to nothing. Residence is not settlement, and by act. of 1794, a settlement can never be gained by residence for any length of time.

That there can be no constructive residence is determined in *Exeter* v. *Brighton*, 15 Maine R. 58.

*F. Allen*, for the defendants in. error. From the evidence it is fully established, that the pauper whose settlement is in dispute, had a home in the town of Jefferson, prior to 1821. It is equally clear that he never had any home in any other place whatsoever. A home, or domicil, once acquired by actual residence, continues until that home is abandoned, and a new one acquired. This is a principle of universal application, and every where adopted. Once having a home, it *constructively* continues till the acquisition of a new one, in this case, equally as if the pauper had been traversing the ocean or travelling on land. One may have a home in a town, without any fixed abode in that town. *Parsonsfield* v. *Perkins*, 2 Greenl. 211 ; *Boothbay* v. *Wiscasset*, 3 Greenl. 354 ; *Wilton* v. *Falmouth*,

15 Maine R. 479. A domicil, once acquired, is not lost until a new one has been actually gained. Vattel, b. 1, c. 19, § 218; Story's Conflict of Laws, 40; *Jennison* v. *Hapgood*, 10 Pick. 77; *Somerville* v. *Somerville*, 5 Ves. 756; 2 Kent's Com. 431; *Andrews* v. *Hinds*, 4 Cow. 516; *St. George* v. *Deer Isle*, 3 Greenl. 390. The case, so far from finding that he removed or intended to remove to any other place, does not even find that he remained a single week in any other town. Having then a constructive home in Jefferson, his settlement is fixed there by the incorporation of that town, as well as by the St. 21st March, 1821.

*Ruggles*, in reply. The pauper had no home in Jefferson except for two brief periods of time. He was not there at the incorporation of the town, nor in March, 1821. The principle upon which the counsel for the defendants rests his case, is, that a man can never be without a home, actual or constructive, and therefore can never lose one home till he has acquired another. This principle, which, with certain exceptions and qualifications, is recognized by writers on the civil law, applies to questions of national domicil, arising in the consideration of citizenship, allegiance, and other public and social relations and conditions. In those cases, domicil is used in a broad and indefinite sense, and not to express a dwellingplace or a family establishment.

When questions of national domicil have arisen, the inquiry is not whether a man has a dwellinghouse in a particular town or district, or whether he has any fixed abode; but to what country he belongs, and to what nation he owes allegiance, independently of any considerations of residence in any particular spot. His original national domicil, *(forum originis,)* continues by the law of nations till another is acquired. In our own, as well as in the European jurisprudence, domicil is of different kinds — *commercial, national, political, civil,* and *forensic* — the evidence of which varies with the subject matter to which it relates.

The cases cited as adverse to the plaintiffs, relate to questions of allegiance, or to the distribution of property, and analogous

cases, in all which it is perceived the individual must have a home somewhere—and in which this fiction of the continuance of the old home till the acquisition of the new, is adopted.

But *home,* as used in the pauper acts, is a very different thing. In no instance has the doctrine here contended for ever been recognized as applicable to questions arising under them. The language of those statutes, *(dwelling and having a home,)* indicate what kind of home was contemplated ; not a home without a dwelling, nor a dwelling without a home ; but both a dwelling and a home, each qualifying the other.

It is true, by statute, that a *settlement,* once established, remains till another is acquired ; but settlement, like citizenship, or allegiance, may be 'where home is not. Derivative settlement may exist where a person never had a home. Settlement and home are therefore different. One is a municipal qualification, imposing municipal obligations, without regard to home. The other is inseparable from the idea of definite locality or habitation — changes with it, and is lost by losing it. *Turner* v. *Buckfield,* 3 Greenl. 229 ; *Hampden* v. *Fairfield,* 3 Greenl. 436.

The opinion of the Court was delivered by

WHITMAN C. J. — The plaintiffs have sued out a writ of error, against the defendants, to reverse a judgment of the late Court of Common Pleas, rendered on a complaint, originally filed before a magistrate, and brought into that Court by appeal, under a statute providing for the settlement and support of the poor. ‛The present defendants allege, in their complaint that, one Nathaniel Place had become chargeable to them, and that his settlement is in Jefferson ; and pray for his removal, &c. The statute required that the Court of Common Pleas should state the facts, on which it might ground its decision, in cases of this kind. Accordingly the Judge of that Court stated the facts, as they were developed on the trial. The question now is, whether they will support his decision.

It appears that the pauper, between 1797 and 1802, hired a small strip of land, in what is now Jefferson, then an unincor-

porated plantation, which he cultivated about two years; and lived there during that time. The Judge who tried the cause says, "from this fact, it is considered to be proved, that he then acquired a residence, and had his home" there. Jefferson was incorporated in 1807. From 1802 to 1810 the pauper seems to have been in the habits of vagrancy, wandering from place to place; but that the centre of his rambles, as the statement is, would have fallen somewhere within the limits of Jefferson; and in 1807, when that town was incorporated, the Court say, " he had no residence or dwellingplace there, unless constructively, it may be inferred from the domicil, which he had previously acquired in the plantation above mentioned. Sometime between 1810 and 1816, it appeared, that the pauper, for two seasons, occupied, without right, a small lot of land in Jefferson, and built a camp thereon; in which he sometimes lodged and took his meals; and in 1819 sold his " supposed claim" for fifty cents. In 1811 and 1812, he was taxed in that town. Aside from this, his vagrant life was continued, without being confined to any spot or town, for any considerable length of time, working at one place or another, occasionally, just enough to procure the means of relief from instant distress, or from the cravings of his appetite for ardent spirit, having no property or even a change of apparel. On the 21st of March, 1821, the Judge says, it did not appear where he was.

From these facts it would seem, that the Judge must have considered the settlement of the pauper to have been in Jefferson, either because he dwelt and had his home there, on the 21st of March, 1821, or because he dwelt and had his home there at the time the town was incorporated, or both. The Judge is silent as to which of them he relied upon. It might be upon both.

In requiring the Judge of the Court of Common Pleas to report the facts, on which any decision he might make, might be predicated; and providing for a revision of his adjudication by writ of error, it is manifest, that the legislature intended to place his finding, as to the facts, upon the footing of a special

verdict. In a special verdict whatever fact is explicitly found the Court will notice; but whenever the facts necessary to the support of any position, are indistinctly found, or are left to be gathered from inference, only, the Court must reject them. In the case at bar, the decision of the Court of Common Pleas must be supported by facts distinctly found by the Court, or it cannot be sustained.

The Judge in making his statement of facts, having used the terms residence and home *as being such constructively*, would seem to have considered, that residence and home were synonymous with settlement, as applicable to paupers, and it is well understood that a settlement thus applied, may be derivative.

This word settlement, in reference to paupers, has become in a manner technical; insomuch, that, when it is said that a person has his settlement in a particular town, the meaning is, that he has, in case of need, a right to support from the inhabitants of that town. The words dwellingplace and home, and the term settlement therefore may have very different significations. A person may have his settlement different from his dwellingplace and home. Indeed, he may have a settlement in a place in which he never had either a dwellingplace or home; as in the case of children born whilst their parents live in one town, having their settlement in another. This presents a case of a derivative settlement. But a derivative or constructive residence and dwellingplace, can hardly be what the statute contemplates, when it speaks of a person's dwellingplace and home, as fixing his settlement. Indeed, what is meant by a constructive residence and home is not readily apprehended.

The counsel for the defendants in error, in his argument, treats the words, dwellingplace and home, as if synonymous with domicil, and proceeds to argue, that one domicil continues till another is gained; and that to have a domicil a man need not have any particular place of dwelling, or for his home; and he cites numerous authorities to support his position. But the answer to them all is, that domicil, though in

familiar language used very properly to signify a man's dwellinghouse, has, in cases arising under international law, and in kindred cases thereto, a sort of technical meaning. And the authorities cited, all apply to it in this sense. It fixes the character of the individual, in reference to certain rights, duties and obligations; but dwellingplace and home have a more limited, precise and local application.

When the legislature speak of dwellingplace and home, as being requisite to establish the *settlement* of paupers, it cannot mean to use those terms in a vague and indeterminate sense. Something specific was in comtemplation. It was intended to define, so that it could not be misunderstood; and so that it should be obvious to the common sense of every man, what should constitute a settlement. Constructive dwellingplaces and homes, if there be any such, could not have been in contemplation. If a man actually has a home or dwellingplace, all his fellow townsmen can at once see and know it; but as to constructive dwellingplaces and homes, who can tell what they are, or where they are to be found, or to which of the senses they can be made obvious. In the case of *Turner* v. *Buckfield*, 3 Greenl. 229; it is expressly decided, that the words dwellingplace and home meant some permanent abode or residence, with intention to remain.

The case of *Parsonsfield* v. *Perkins*, 2 Greenl. 411, may seem to indicate a qualification of the above decision. In that case, however, the construction was extended as far as to most understandings, would be obviously proper. Some confusion in that case may have arisen from having seemingly confounded dwellingplace and home, with domicil, in international law. The Judge in delivering the opinion of the Court speaks of the domicil, instead of his dwellingplace and home, as having continued after he ceased to have any actual dwellingplace and home, in Parsonsfield, and many years after he had become a vagrant. But the Court, in that case, lay much stress upon his having dwelt many years there, formerly, with his wife and children; who still remained there, and with whom he might at any time, have united himself; and upon the circum-

stance that he had confined his ramblings almost wholly to Parsonsfield. And these are features, which do in some measure at least, distinguish that case from the one at bar. Place rambled at large; and had, seemingly no inducement to confine himself to one place more than to another, for ardent spirit was, in those days, every where to be obtained.

A home and dwellingplace do not, necessarily, continue until another is acquired. A man may break up his establishment, and divest himself of property, and become a wanderer, and there will be an end of his dwellingplace and home, as effectually as if he were to gain a home in another place. It has been held in this State, that a man may so abandon his home; and thereupon cease to have any home. *Exeter v. Brighton,* 15 Maine R. 58. In the case just cited, the pauper, on the 21st March, 1821, was on his way to establish his home in another place. But suppose he had wandered about, and had gone to no other place, his home would still have been broken up; and so likewise if he had abandoned his home and dwellingplace, without any design to establish himself elsewhere. It is not even necessary that he should proclaim his design to do so. His acts might speak as decisively to that effect as his words could do. To say, if a man breaks up his establishment, and actually ceases to have a home and dwellingplace, that he still has a constructive home in the place which he had abandoned, is taking ground which certainly cannot be tenable. And if a man becomes a worthless, dissolute vagabond, a wanderer from place to place, and from town to town, often depending upon the hand of charity, wherever it may be found, for relief from present suffering, could it be said that such a man, had a dwellingplace and home? To the Court it would seem to be an abuse of terms.

It is therefore considered by this Court, that the judgment of the Court of Common Pleas, be reversed, and that the plaintiffs in error recover of the defendants in error the sum of                              being the amount of loss sustained by the former decision.