DELAWARE, L. & W. R. CO. v. PETROWSKY.

(Circuit Court of Appeals, Second Circuit. March 7, 1918.)

No. 102.

1. COURTS ⊜⊃307(1)—FEDERAL COURTS—JURISDICTION—"CITIZEN."
    The term "citizen," as used in the Judiciary Act with reference to the jurisdiction of the federal courts, is substantially synonymous with the term "domicile," and denotes a citizen of the United States residing permanently in a particular state.
    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Citizen.]

2. DOMICILE ⊜⊃4(2)—CHANGE—EVIDENCE.
    To abandon one domicile for another means something far more than a mere change of residence, for, being a proceeding of a serious nature, the intention to abandon must be proved by satisfactory evidence.

3. DOMICILE ⊜⊃8—CHANGE—BURDEN OF PROOF.
    A party asserting that a change of domicile has taken place has the burden of proof.

4. DOMICILE ⊜⊃4(2)—CHANGE—INTENTION.
    Ordinarily, the courts are not concerned with the motives by which a party may have been influenced to change his domicile, if a fixed intention to abandon one domicile and acquire another appears.

⊜⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

5. CITIZENS ⬤⟶9—CHILDREN—NATURALIZATION OF PARENT.

On naturalization of a foreign subject, an infant child of such subject, though it was born in a foreign country, becomes a citizen of the United States.

6. COURTS ⬤⟶307(1)—FEDERAL COURTS—JURISDICTION.

Where plaintiff at the time of the commencement of his action was domiciled in a state different from that of defendant, he is a citizen of that state for the purpose of suing in the federal courts.

7. DOMICILE ⬤⟶5—INFANTS—DOMICILE OF ORIGIN.

Every person at his birth acquires a domicile of origin which is that of the person on whom he is legally dependent, and in case of a legitimate child is that of its father, and in case of an illegitimate child that of its mother.

8. DOMICILE ⬤⟶5—CHANGE—MINORS.

The general rule is well established that a person while a minor being non sui juris cannot change his or her domicile.

9. INFANTS ⬤⟶9—EMANCIPATION—EFFECT.

A minor child may be emancipated by its parent's consent express or implied.

10. INFANTS ⬤⟶9—"EMANCIPATION"—EFFECT.

"Emancipation" of a minor child by its parent involves an entire surrender of the right to the care, custody, and earnings of such child as well as a renunciation of parental duties.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Emancipation.]

11. INFANTS ⬤⟶10—EMANCIPATION—MARRIAGE.

It is well settled that the marriage of a minor with his father's consent works an emancipation, the reason being that his new relation is inconsistent with subjection to the control and care of the father.

12. DOMICILE ⬤⟶5—SERVANT.

There is no authority in law or anything in the circumstances of modern life establishing a definite rule or even a presumption as to the domicile of a servant, and whether he has a domicile in the same country as his master must, as in other cases, depend on the combination of fact and intention.

13. DOMICILE ⬤⟶2—"RESIDENCE"—STATUTES—CONSTRUCTION.

"Residence" and "domicile" are two perfectly distinct things, but residence as used in statutes defining political rights is synonymous with domicile and denotes a permanent residence.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Domicile; Residence.]

14. APPRENTICES ⬤⟶1—CONTRACT—NATURE OF.

In view of the New York Domestic Relations Law (Consol. Laws, c. 14), an agreement, whereby the parents of an infant emancipated him transferring his care and custody to an older brother to whom the infant was indentured as a house and personal servant for the period of his minority, did not create the relation of master and apprentice between the infant and his elder brother; the term "apprentice," which is derived from the French word "apprendre," meaning to learn, and denoting a person who is bound to and who serves another for the purpose of learning some trade, etc., which the other is to teach him.

[Ed. Note.—For other definitions, see Words and Phrases, Apprentice.]

15. DOMICILE ⬤⟶1—"SETTLEMENT" DISTINGUISHED FROM "DOMICILE."

A "settlement" within the pauper acts is distinct from "domicile," depending on the time of residence, while no particular length of residence is necessary to acquire a domicile.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Settlement.]

⬤⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

16. DOMICILE ⬦═5—CHANGE OF DOMICILE—INFANTS.

Where a minor child was emancipated by his parents and indentured as a servant for his minority to an elder brother who lived in another state, such infant must be deemed to have acquired a domicile in the latter state, regardless of whether he was an apprentice or whether the domicile of an apprentice follows that of the master; the case being analogous to one where a father a resident of one state appoints as a testamentary guardian a resident of another state with the intention that the domicile of the ward shall be changed to that of the guardian.

17. DOMICILE ⬦═5—MINOR—APPRENTICE—DEATH OF MASTER.

Where a minor child whose parents resided in Pennsylvania acquired a domicile in New York by reason of an indenture as a servant during minority to a brother living in New York, the death of the brother after the minor had begun suit in the federal court against a Pennsylvania corporation cannot be deemed to have divested the minor of his New York domicile and revived his domicile in Pennsylvania so as to defeat the jurisdiction of the federal court based on diversity of citizenship.

18. DOMICILE ⬦═5—MARRIED WOMAN—DEATH OF HUSBAND.

A woman on marriage acquires the domicile of her husband, but on his death her domicile of origin does not revive but she retains her husband's last domicile until she changes it.

19. MASTER AND SERVANT ⬦═245(3)—NEGLIGENCE—STATUTE.

Where an employé of a Pennsylvania mining company was injured while riding on a loaded mine car in violation of Pennsylvania Anthracite Mining Act (Act June 2, 1891 [P. L. 197]) art. 12, rule 16, the mining company must be deemed negligent, where such employé rode upon the loaded cars in obedience to the directions of superior employés whose orders he was required to obey and it appeared that it was the general practice in the mine for employés to ride loaded cars.

20. MASTER AND SERVANT ⬦═129(1)—INJURIES TO SERVANT—NEGLIGENCE.

Where two concurring causes contribute to an injury to a servant, the fact that the master may not be responsible for one of them does not absolve him from liability for the other for which he is responsible.

21. MASTER AND SERVANT ⬦═228(2)—INJURIES TO SERVANT—CONTRIBUTORY NEGLIGENCE.

Where a Pennsylvania mining company did not post the rules of the Anthracite Mining Act as required, a boy of 17 who rode on a loaded mine car in obedience to an order given him by one in authority cannot be deemed guilty of contributory negligence because he was riding in violation of the act and thus precluded from recovery.

In Error to the District Court of the United States for the Eastern District of New York.

Action by Ignatz Petrowsky, an infant, by Ona Roder, his guardian ad litem, against the Delaware, Lackawanna & Western Railroad Company. There was a judgment for plaintiff, and defendant brings error. Affirmed.

This cause comes here on writ of error to the United States District Court for the Eastern District of New York. The plaintiff alleges that he is a resident and citizen of the state of New York in the Eastern district. The defendant is alleged to be a corporation organized and existing under the laws of the state of Pennsylvania. The plaintiff sues to recover for certain injuries he sustained on October 8, 1913, while employed by defendant in a certain mine in the state of Pennsylvania, which mine defendant owned and operated. The jury rendered a verdict in plaintiff's favor for $40,000, which by consent and stipulation of plaintiff was reduced to $27,500. Judgment was entered accordingly in the sum of $27,697.70.

⬦═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

W. S. Jenney, of New York City, and F. W. Thompson, of St. Louis, Mo. (A. J. McMahon and J. E. Morrissey, both of New York City, of counsel), for plaintiff in error.

Baltrus S. Yankaus, of New York City (Albert Massey, of New York City, of counsel), for defendant in error.

Before ROGERS and HOUGH, Circuit Judges, and LEARNED HAND, District Judge.

ROGERS, Circuit Judge. [1] If the court below had jurisdiction of this case it is because of the diversity of citizenship of the parties. But the defendant in its answer alleges that no such diversity of citizenship exists. It denies that the defendant is a citizen of the state of New York as he claims, and it asserts that he is a citizen of the state of Pennsylvania in which the defendant itself resides.

The term "citizen," as used in the Judiciary Act with reference to the jurisdiction of the federal courts, is substantially synonymous with the term "domicile." It means a citizen of the United States residing permanently in the particular state. Case v. Clarke, 5 Fed. Cas. 254; Catlett v. Pacific Ins. Co., 5 Fed. Cas. 291; Gardner v. Sharp, 9 Fed. Cas. 1196, 1199; Winn v. Gilmer (C. C.) 27 Fed. 817; Sharon v. Hill (C. C.) 26 Fed. 337, 342; Zambrino v. Galveston, etc., R. Co. (C. C.) 38 Fed. 449, 453; Illinois Life Ins. Co. v. Shenehon (C. C.) 109 Fed. 674, 675; Marks v. Marks (C. C.) 75 Fed. 321, 324; Harding v. Standard Oil Co. (C. C.) 182 Fed. 421, 423, 424; Pennsylvania Co. v. Bender, 148 U. S. 255, 13 Sup. Ct. 591, 37 L. Ed. 441; Wolfe v. Hartford Life & Annuity Ins. Co., 148 U. S. 389, 13 Sup. Ct. 602, 37 L. Ed. 493.

Was the plaintiff domiciled in the state of New York when this suit was commenced?

At the time of the accident plaintiff was a minor, being 17 years of age. His father was born in Russia, a subject of the Czar, and came to this country in 1900, taking up his residence in the state of Pennsylvania, where he has resided ever since. The father was naturalized on May 26, 1911, becoming a citizen of the United States at that time. The plaintiff was then living with his father and continued so to do until May or June, 1914, when his father turned him out to earn his own living.

The father testified that after the injury to the plaintiff he told him he could not support him and to go away. "I cannot support you any longer, so you can go wherever you like." Prior to that the boy had lived at home and paid his board from his earnings made by working in the mine. After this conversation he left his home in Pennsylvania and went to his brother Peter, who lived at Hempstead, Long Island, N. Y., and in August of the same year an indenture was entered into by which plaintiff was indentured to his brother at Hempstead as a personal and house servant for the period of his minority.

The theory of the plaintiff is that he became emancipated from the care and custody of his parents by what is alleged to be articles of apprenticeship which transferred his care and custody to his brother.

The theory of defendant is that the plaintiff being a minor had the

·domicile of his father during his minority, and could not during the period of his minority become a citizen of a state in which his father did not have his domicile.

By the indenture the parents expressly agreed:

"That the said Ignatz Petrowsky shall be emancipated from the care and custody of his parents, and it is hereby intended to transfer such care and custody to said Peter Petrowsky, who hereby agrees to assume the same and provide for the maintenance, education and other care of said infant to the same extent as his said parents would have been bound to provide for the same if the said infant had not been indentured and emancipated as hereinabove provided."

·The indenture was for the entire period of plaintiff's minority. And the question presented is whether notwithstanding the indenture the citizenship of the plaintiff continued to be the same as his father's which we have seen was in Pennsylvania, or whether it became the same as his brother's which was in New York.

[2, 3] In a recent case in the House of Lords the Earl of Halsbury pointed out that to abandon one domicile for another means something far more than a mere change of residence. It is, he said, a proceeding of a very serious nature and the intention to abandon is required to be proved by satisfactory evidence. Huntly Marchioness v. Gaskell (1906) A. C. 56, 66, 67. The burden of proof rests on the party who alleges that a change of domicile has taken place. U. S. Trust Co. v. Hart, 150 App. Div. 413, 135 N. Y. Supp. 81.

[4] The parties may have intended by the execution of this indenture to work a change of domicile with the view of enabling the plaintiff to sue in the Southern district of New York. But the courts are not ordinarily concerned with the motives by which a party may have been influenced to change his domicile, if in fact it appears that there was an absolute and fixed intention to abandon one domicile and acquire another. Matter of Newcomb, 192 N. Y. 238, 84 N. E. 950.

[5, 6] As children born within a country of parents who are subject to the jurisdiction thereof are citizens of such country, the plaintiff was born a subject of the Czar. When his father by naturalization became a citizen of the United States, the plaintiff, being a minor at the time and living within this country, became a citizen of the United States by virtue of the father's naturalization. And for purposes of jurisdiction he was a citizen of the state of Pennsylvania where his father had his domicile. If the plaintiff at the commencement of the action is domiciled in a different state from that of defendant, he is a citizen of that state for the purpose of suing in the court of the United States. Gilbert v. David, 235 U. S. 561, 35 Sup. Ct. 164, 59 L. Ed. 360.

[7] The law is well established that every person at his birth acquires a domicile of origin which is that of the person on whom he is legally dependent, which in the case of a legitimate child is that of its father, and in the case of an illegitimate child is that of its mother.

[8] The general rule is also well established that a person while a minor being non sui juris cannot change his or her domicile.

"A domicile once acquired is retained until it is changed (1) in the case of an independent person, by his own act; (2) in the case of a dependent person, by the act of some one on whom he is dependent." Dicey on Domicile, p. 66.

And Dicey goes on to say that in the case of an infant the person capable of changing the domicile is the person on whom the infant "is, for this purpose at any rate, dependent, who in most instances is the infant's father." If in most instances the father can change the infant's domicile, there must be instances when he cannot, although perhaps another may. And if the child's domicile of origin can be changed by the act of one on whom the child is dependent, it would seem that if the parents relinquish to another the care, custody, and control of the child during his minority the one who assumes the custody and control and agrees to care for and maintain him to the same extent as his parents would have a right to change his domicile. But the question presented is not so simple as it seems. On the contrary, it is perplexing and not free from doubt. There is too a strange lack of authority upon the subject.

[9, 10] That a minor child may be emancipated by its parent's consent express or implied is established law. That "emancipation" involves an entire surrender of the right to the care, custody, and earnings of the child, as well as a renunciation of parental duties, is also established. Inhabitants of Carthage v. Inhabitants of Canton, 97 Me. 473, 476, 54 Atl. 1104; Rounds Bros. v. McDaniel, 133 Ky. 669, 118 S. W. 956. 134 Am. St. Rep. 482, 19 Ann. Cas. 326; Brosius v. Barker, 154 Mo. App. 657, 136 S. W. 18; Bristor v. Chicago & N. W. Ry. Co., 128 Iowa, 479, 104 N. W. 487. But does emancipation confer upon the child a right to choose his own domicile? In 29 Cyc. 1675, it is said that the effect of emancipation is to confer upon the child freedom to act on its own responsibility with the same independence as though it had attained majority. If that be true, then an emancipated child has a right to choose its own domicile. But the cases cited to support the statement do not establish the proposition. They establish, however, that a parent who emancipates a minor child confers upon it the right to labor on its own account, and to appropriate to its own use whatever it may earn. Crowley v. Crowley, 72 N. H. 241, 56 Atl. 190; Stanley v. National Union Bank, 115 N. Y. 122, 22 N. E. 29. It is not so clear what else it confers.

The leading authority in England on the domestic relations states that:

"The only effect of emancipation as between parent and child would seem to be that it gives a right to a minor child to his own wages or earnings." Eversley on Domestic Relations, p. 600.

[11] It appears to be settled that the marriage of a minor with his father's consent works an emancipation, the reason given for this proposition being that the marriage gives rise to a new relation inconsistent with subjection to the control and care of the parent. The husband is the head of a new family and as such is subject to obligations and duties to his wife and children which require him to be the master of himself, his time, his labor, earnings, and conduct. Sherburne v. Hartland, 37 Vt. 528; Cochran v. Cochran, 196 N. Y. 86, 89,

89 N. E. 470, 24 L. R. A. (N. S.) 160, 17 Ann. Cas. 782; State ex rel. Scott v. Lowell, 78 Minn. 166, 80 N. W. 877, 46 L. R. A. 440, 79 Am. St. Rep. 358. And in Commonwealth v. Graham, 157 Mass. 73, 75, 31 N. E. 706, 16 L. R. A. 578, 34 Am. St. Rep. 255, it is said not to be clear that the marriage of a minor without his father's consent does not have the same effect, although the decision in White v. Henry, 24 Me. 531, is contra. We are not now concerned with this except to observe that marriage of a minor does not emancipate him from all the disabilities of his infancy. Chapman v. Hughes, 61 Miss. 339. And it does not appear that it entitles him to acquire a domicile. Dicey, in his Conflict of Laws (Moore's Ed. p. 128), calls attention to the fact that it has been suggested that a man though a minor may possibly acquire a domicile for himself by marriage and declares that the reasoning by which the suggested exception is supported is unsound, and the existence of the exception itself he deems open to great doubt.

[12] The articles of indenture to which attention has been called bound the plaintiff to his brother "as a personal and house servant." If under these articles the plaintiff is to be regarded as a servant, he did not acquire the domicile of his "master or employer" as the articles described the brother to whom he was indentured.

A servant is sometimes said to have the domicile of his master, but Dicey, in his Conflict of Laws (Moore's Ed. p. 151), says:

"There is not, however, any authority in English law, or anything in the circumstances of modern life, establishing a definite rule, or even a presumption, as to the domicile of a servant. Whether he has or has not a 'permanent home' in the same country as his master must, as in other cases, depend upon the combination of fact and intention."

And in this respect we believe there is no difference between English law and the law of this country.

[13-16] But is the plaintiff to be regarded in fact an apprentice rather than a servant? For in 14 Cyc. 845, it is laid down that the domicile of the master is the domicile of his apprentice. The only case cited in support of the proposition is Maddox v. State, 32 Ind. 111. The court in that case cited no authorities, but held that the residence of the master was the residence of the apprentice, and the latter while a minor could not by leaving his master and going to another state change that residence, although he would have that power after he arrived at full age.

Now "residence" and "domicile" are two perfectly distinct things, as Lord Westbury pointed out in Bell v. Kennedy, L. R. 1 H. L. Sc., 320, 321, and as Lord Macnaghten pointed out again in Winans v. Attorney General, [1904] A. C. 287, 290. In the Indiana case the court speaks of "residence," but the word "domicile" is not once mentioned. It is, however, well settled that residence as used in statutes defining political rights is synonymous with domicile. It denotes a permanent residence. Dicey nowhere lays down the rule that an apprentice has the domicile of his master, and we know of no English case which so decides. The Indiana case, however, must be regarded as such an authority.

The institution of apprenticeship in England dates from about the twelfth century. And by the 5th of Eliz. c. 4, it was enacted that no person should exercise any trade or mystery without having served a seven years' apprenticeship. This continued to be the law until 1814, when by 54 Geo. III. c. 96, the statute of Elizabeth was repealed and apprenticeship ceased to be compulsory. If apprenticeship worked a change of domicile, it is rather remarkable that no English case is found which declares the principle. If any such case exists, it has not been called to our attention, and after diligent inquiry we have been unable to discover it.

The term "apprentice" is derived from the French word "apprendre," which means to learn. The word indicates the essential and characteristic incident of the contract of apprenticeship. It signifies a relationship of which the primary purpose is the giving and receiving of instruction in a profession, trade or employment.

In Lyon v. Whitemore, 3 N. J. Law, 846 (1811), an "apprentice" is defined to be a young person bound by indenture to a tradesman or artificer who, upon certain covenants is to teach him his trade. And in St. Pancras v. Clapham, 2 El. & El. 742, Cockburn, C. J., said that:

"An apprentice seems to be a person who is bound to and who serves another for the purpose of learning something which the other is to teach him."

And in Labatt's Master & Servant (2d Ed.) vol. 6, § 2058, it is said that:

"Apprenticeship may be succinctly defined as a contract by which one person agrees to perform certain services under the control of another, for the purpose of receiving such special instruction as will qualify him for the occupation to which the services have reference."

There is nothing in the indenture in the instant case which indicates that the purpose was to teach the plaintiff a trade or employment, or to aid him in acquiring any kind of technical knowledge.

Moreover, the Domestic Relations Law of New York, in which state the "master or employer" resided and the service was to be performed, provides that:

"If such minor is bound as an apprentice to learn the art or mystery of any trade or craft, an agreement on the part of the employer to teach, or cause to be carefully and skillfully taught, to such apprentice, every branch of the business to which such apprentice is indentured, and that at the expiration of such apprenticeship he will give to such apprentice a certificate, in writing, that such apprentice has served at such trade or craft a full term of apprenticeship specified in such indenture." Birdseye's Cumming & Gilbert's Consolidated Laws of New York, Ann., vol. 1, p. 1082, § 121, subd. 8.

A contract which provides both for the performance of services by one of the parties and for the giving of instruction by the other is to be deemed a contract of hiring and service or of apprenticeship, according as it may appear that its primary and essential purpose is the performance of services or the imparting of instruction. Labatt's Master & Servant (2d Ed.) vol. 6, p. 6396. In the case now before the court it is difficult to discover that the primary purpose was the imparting of instruction in a trade by a master. And we are

forced to conclude that the articles of indenture did not in fact create the technical relation of master and apprentice as that relation is known to the law. We conclude also that the authorities do not show conclusively whether an apprentice acquires or does not acquire the domicile of his master.

The Stat. 3 W. & M. c. 11, § 8, enacted that:

"If any person shall be bound an apprentice by indenture, and inhabit in any town or parish, such binding and inhabitation shall be adjudged a good settlement."

And in The King v. Banbury, 5 B. & Ad. 176, a pauper was bound an apprentice to one A., whom he served half a year. Then A. failed in business and told the apprentice he might go and work for one B., who lived in another parish. This the apprentice did for a year in B.'s parish, and then with the consent of A., his first master, he went to work for C. in a third parish. It was held that the inhabitation of the apprentice in the second and third parishes was connected with the apprenticeship and being so connected that he thereby gained settlements in those parishes by virtue of the statute. We are not, however, much aided in our inquiries by decisions as to the meaning of the word "settlement" in construing pauper acts. When it is said that a person has a "settlement" in a particular town or county, the meaning seems simply to be that he has a right to support in case of need from the town or county in which he has his "settlement." It is plain that "settlement" is not synonymous with "domicile." The statutes on the subject usually provide that a person who shall reside in any poor district for a given period of one, two, or more years and who fulfills the other requirements of the statute shall thereby acquire a legal settlement therein. A person may have to reside for years in a place to acquire a settlement therein although he may acquire a domicile at such place as soon as he arrives. The length of time a person resides in a place to which he goes with the animus manendi is immaterial as respects his acquisition of a domicile. Winans v. Winans, 205 Mass. 388, 91 N. E. 394, 28 L. R. A. (N. S.) 992. But it is of controlling importance as respects his right to claim a settlement. And in Bellefonte v. Somerset County, 168 Pa. 286, 31 Atl. 1086, it was held that a settlement is gained where the services are performed under a contract of hiring, although the pauper has his residence elsewhere. It would hardly be held that a man's domicile was where he worked as distinguished from the place where he had his abode. It is pointed out in 22 Am. & Eng. Encyc. of Law, p. 954, that the term "residence" as used in the poor laws so as to confer a settlement is not synonymous with "domicile" as used in international law. And see to the same effect Inhabitants of Jefferson v. Inhabitants of Washington, 19 Me. 293, 300, 301.

It does not seem to be of controlling importance therefore that the courts have held that an emancipated minor may acquire a "settlement" in his own right (Oldtown v. Falmouth, 40 Me. 106, 108; West Gardiner v. Manchester, 72 Me. 509); or that a minor bound to service in a written indenture by the overseers of the poor cannot acquire a settlement in his own right inasmuch as he has not been emancipated

by the consent of his parents (Oldtown v. Falmouth, supra; Frankfort v. New Vineyard, 48 Me. 565).

It has been held that the domicile of a ward is not that of a guardian where they are living in separate places. Louisville v. Sherley, 80 Ky. 71; Chester v. James, 2 Watts & S. (Pa.) 568. But in White v. Howard, 52 Barb. (N. Y.) 294, where the father domiciled in Connecticut appointed as the testamentary guardian of his child a person living in New York and the child on the death of the father went to live with the guardian in New York, it was held that the ward's domicile was in the latter state. "It is manifest, from the will," the court said, "that her father expected and intended that she should, upon and after his death, during her minority, reside in New York, under the care and protection of her guardian residing there. It is evident that her father intended, by his will, upon and after his death, to change her domicile from Connecticut to New York." And a testamentary guardian nominated by the father has the same control over the ward's domicile that the father had, and may in good faith change it either from one state to another state or from one county to another county in the same state. Lamar v. Micou, 112 U. S. 452, 471, 26 L. Ed. 774; Id., 114 U. S. 218, 5 Sup. Ct. 857, 29 L. Ed. 94; Wood v. Wood, 5 Paige [N. Y.] 595, 605, 28 Am. Dec. 451; In re Benton, 92 Iowa, 202, 60 N. W. 614, 54 Am. St. Rep. 546; Bailey v. Morrison, 4 La. Ann. 523; 21 Cyc. 63. A testamentary guardian has the custody of the child by the express authorization of the father and so does the master as respects the apprentice. But the testamentary guardian has, what the master has not, the custody of the ward's real and personal estate until the ward reaches his majority. In this particular the master, however, has no disadvantage over the parent, as the latter has no control over the general property of his child. The parent has a right to the minor's labor and earnings, and so has the master. The right of the parent to change the child's domicile does not therefore depend upon or grow out of any power over the property of the child. It would seem that it must depend upon his having the parent's right to the custody and control of the child. On the whole, therefore, we are inclined to hold and do hold that where a parent surrenders as in this case the care and custody of his minor child during his minority to one who agrees to assume such care and custody and to provide for such child for the whole of the remaining period of his minority the maintenance, education, and care of the infant to the same extent as his parents would have been bound to provide them if no such agreement had been made, the child acquires the domicile of the person who assumes this responsibility. In this case the custody was as fully surrendered to the son in New York by the parent in Pennsylvania, as it was to the testamentary guardian residing in the state of New York by the parent living in Connecticut in White v. Howard, supra, and we conclude that the intention of the parent was, in this case as it was held to be in that, that the child should acquire a New York domicile. Such an agreement creates something more than the ordinary relation of master and servant. And whether or not it created the technical relation of master and apprentice it imposed upon the one

'assuming the responsibility the full measure of the parent's duty to the child, and it gave him the full power of control over the child that the parent possessed. For that reason we fail to see why the person who was with the father's consent thus placed in loco parentis did not have the same power the parent had as respects the child's domicile. And if at the time of the agreement the one who thus stands in loco parentis lives in another state to which the child is removed we fail to see any adequate reason why the child does not acquire such person's domicile. We therefore hold that the court below had jurisdiction.

[17, 18] It appears that the brother to whom the surrender of the plaintiff's custody was made by the indenture died on March 19, 1915. This was after this action was commenced, and if at that time the plaintiff's domicile was in New York the subsequent death of his brother could have no effect upon the right to maintain it. It is not at all clear that by the death of his brother the plaintiff reacquired his domicile of origin, and so lost his right to commence an action in a federal court in the state of New York.

A woman on marriage acquires the domicile of her husband, but on his death her domicile of origin does not revive, but she retains her husband's last domicile, until she changes it. Dicey on Domicile, p. 7. And upon marriage the maiden settlement of the wife is said to become extinct, and does not revive on the death of her husband, but she retains the settlement of the husband. No reason suggests itself why the same principle would not be applicable to the facts of this case, and no authority asserting a contrary doctrine has come to our notice.

[19, 20] The other questions which are involved in the case can be more readily determined. The plaintiff was employed by the defendant and was injured in the course of his employment while riding upon one of a train of cars which was being operated by defendant in the mine in which plaintiff was employed. The Anthracite Mining Act of Pennsylvania approved June 2, 1891, provides that:

"No person shall ride upon or against any loaded car, cage or gun boat in any shaft, slope or plane in or about a mine or colliery." Article 12, rule 16, (P. L. 197).

And this provision the plaintiff was violating when the accident happened. The record, however, discloses that plaintiff, if he told the truth, was riding on the car in obedience to instructions given him by the driver boss of the mine and also by the slope runner whose duty it was to take the cars up and down the slope, and by a third man who was the engineer in charge of an electric engine which operated the cable that pulled the cars up and down the slope. In the matter of these instructions the plaintiff was contradicted by all three. But plaintiff's testimony was that he rode on these cars every day and 20 or 30 times a day. That he had ridden on the cars was testified to by several witnesses. The plaintiff's claim is that defendant was negligent in that it maintained and allowed a method of having the work in the mine done which was not only prohibited by statute but which the miner himself was forbidden to use, and which was manifestly dangerous. In Maguire v. Philadelphia & Reading Coal & Iron Co., 255

Pa. 6, 99 Atl. 166, the Supreme Court of Pennsylvania, in discussing this identical provision of the statute in a case in which the provision had been violated by the deceased who had ridden on a loaded car and which the workmen had been in the habit of doing with the knowledge and approval of the defendant, said:

"It would be idle to contend that disregard of these plain provisions of the statute in the way indicated would not be negligence on the part of the owner or operator of the mine."

In the instant case it is enough to say that the order given to plaintiff by those in authority over him to ride upon the cars in disregard of the statute was negligence, and under the provisions of section 1 of the Pennsylvania Act (Act June 10, 1907 [P. L. p. 523]) it is expressly provided that in actions brought to recover from an employer for injury suffered by his employé the negligence of a fellow servant of the employé shall not be a defense "where the injury was caused or contributed to by any of the following causes, namely: * * * The negligence of any person to whose orders the employé was bound to conform, and did conform, and by reason of his conforming thereto, the injury or death resulted; the act of any fellow servant, done in obedience to the rules, instructions, or orders given by the employer, or any other person" with "authority to direct the doing of said act."

The defendant insists that this negligence was not the proximate cause of the injury. It asserts that the sole and proximate cause of plaintiff's injuries was the defective and unsafe condition of the railroad track and roadbed at the place of the accident. And it seeks to avoid responsibility for this unsafe condition of the track and roadbed by virtue of the statute of Pennsylvania which relieves the mine owner from liability for the negligence of the mine foreman where it has committed its mine and the underground workings, as had been done in this case, to the charge of a certified mine foreman. The trouble with this is that we do not agree that the sole and proximate cause of plaintiff's injuries was the unsafe condition of the track. The injury which plaintiff suffered did not result solely from the negligence of the mine foreman as respects the track, but was directly contributed to by the negligence of certain employés of the defendant to whose orders the plaintiff was bound to conform. Where two concurring causes contribute to an injury to an employé, the fact that the master may not be responsible for one of them does not absolve him from liability for the other for which he is responsible. Wilmington Star Mining Co. v. Fulton, 205 U. S. 60, 75, 27 Sup. Ct. 412, 51 L. Ed. 708. The case of Maguire v. Philadelphia & Reading Coal & Iron Co., supra, upon which plaintiff relies, is readily distinguishable from the case now before the court.

[21] Then we are asked to hold that as matter of law the plaintiff was guilty of contributory negligence in violating the statute by riding on a loaded car. We cannot accept any such proposition. The fact that a boy of 17 by obeying an order given to him by one in authority over him violates a provision of this kind in the statute which he is not shown to have known cannot be an excuse as between him and the master, and especially is this true where the master, as in this case,

did not post the rules as the act required. For us to hold otherwise would result, as it seems to us, in a monstrous injustice, and enable those who are responsible for the operation of the mine to break the law with impunity. The mine workers would usually obey the unlawful orders of those upon whose favor they were dependent and by obedience to the unlawful order would lose any right to recover for the injuries which resulted. We cannot say that as matter of law such should be the effect of their conduct.

The other assignments of error need not be specifically referred to. We have given them due consideration and find in them no occasion for reversing the judgment. The case was fairly submitted to the jury, and we see no reason why the verdict should be disturbed.

Judgment affirmed.